# Illinois Official Reports

## Appellate Court

*People v. Ortega*, 2021 IL App (1st) 182396

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARIO ORTEGA, Defendant-Appellant. |
| District & No. | First District, Fourth Division No. 1-18-2396 |
| Filed | June 30, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-60176; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Aliza R. Kaliski, of State Appellate Defender's Office, of Chicago, for appellant. |
| | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Noah Montague, and Andrew D. Yassan, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justice Reyes concurred in the judgment and opinion.
Presiding Justice Gordon concurred in part and dissented in part, with opinion.


**OPINION**

¶ 1        Following a bench trial, defendant Mario Ortega was convicted of two counts of first degree murder (720 ILCS 5/9-1(a) (West 2012)) and sentenced to natural life in prison. On appeal, defendant alleges that improper prior consistent statements were admitted against him at trial. He also contends that the imposition of a mandatory natural life sentence is unconstitutional as applied to his case in the absence of an evidentiary hearing pursuant to *People v. Harris*, 2018 IL 121932.

¶ 2        For the following reasons, we affirm defendant's conviction and sentence.[1]


¶ 3                                    I. BACKGROUND

¶ 4        In December of 2013, Angel Mangual (Mangual), Jessica Chaidez (Chaidez), and their one-year-old son lived in a second floor apartment at 1944 North Spaulding Avenue. The building was located at the corner of Spaulding Avenue and Armitage Avenue and had front and rear entrances. The rear entrance led to an alleyway. The building was in an area controlled by the Imperial Gangster street gang. Mangual was a member of the rival Latin Kings street gang, as were co-gang members "Drizzy" (Joshua Johnson) and "King Crazy" (defendant).

¶ 5        On the afternoon of December 11, 2013, Johnson and defendant went to Mangual's house where they drank Hennessy, smoked cigarettes, and marijuana, and played video games. Around 6 p.m., Chaidez left the apartment to join her friends for a "girls' night." Before Chaidez returned home, she called Mangual and told him to get rid of his company so that she and Mangual could relax at home together. Mangual told Johnson and defendant that they had to leave, and they complied with his request.

¶ 6        At approximately 1:24 a.m., Chaidez was driving around her apartment building trying to find a parking spot, when she saw defendant and Johnson suddenly appear from the alley by her building. As Chaidez watched from her car's rear window, she saw defendant run up behind an old man, who was walking on the other side of Spaulding Avenue, and start punching him. Nothing blocked Chaidez's view, and there were streetlights as well as lights coming from the Marble Bar and Grill on Spaulding Avenue. The old man fell to the ground and tried to defend himself by blocking his face.

¶ 7        Chaidez next saw Johnson run over and start patting down the old man. Johnson then got up and tried to pull defendant off of the old man, telling defendant "enough is enough." Defendant, however, pulled out a gun and shot the victim. Johnson ran away when defendant began firing. After firing multiple shots at the victim, defendant also ran away.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 8      According to Mangual, after he heard shots being fired outside of his building, defendant and Johnson returned to his apartment and knocked at his door. Defendant lifted up his shirt, revealing a black pistol, and told Mangual that "they shot an IG," meaning an Imperial Gangster. Mangual told defendant, "Man, it is what it is, you know, but you guys are going to have to, you know, leave from the back porch because I got my wife coming in." Defendant and Johnson wanted to come inside the apartment, but Mangual refused them entry. Mangual testified that he never saw defendant again.

¶ 9      Meanwhile, Chaidez remained downstairs in her car until she heard the ambulance arrive. Chaidez did not call 911 because she was afraid and traumatized, having never seen anything like this before. Upon exiting her car, Chaidez saw that the victim was still on the ground and was not moving. According to Chaidez, she went upstairs to her apartment, hugged her child tightly, and went straight to bed. She did not tell Mangual what she witnessed outside.

¶ 10      Mangual testified that after Chaidez went to bed, Johnson returned to the apartment. After the two spoke briefly, Mangual asked Johnson to leave, and Mangual went to bed as well. Mangual did not talk to the police because he did not want to get involved.

¶ 11      The victim of the shooting was 68-year-old Cayetano Sandoval. At 1:50 a.m., Mr. Sandoval, who resided at 2029 Spaulding, was returning home from his job at Crestone Bakery. The parties stipulated that Dr. Stephen J. Cina, an assistant medical examiner at the Office of the Cook County Medical examiner would testify that Mr. Sandoval's cause of death was multiple gunshot wounds and that the manner of death was homicide.

¶ 12      The following day, December 12, 2013, Chaidez told Mangual what she witnessed outside when she arrived home and told him that she "didn't really appreciate it." Mangual told Chaidez what he knew, and Chaidez testified that "he told me just to keep my mouth shut, and that it's none of my business." Chaidez said that she listened to Mangual's directions because she was afraid and agreed that it was not her business.

¶ 13      Later that day Chaidez went to her friend Benny Blanco's house on Sawyer Avenue and Wabansia Avenue, where 7 to 10 people were hanging out. Chaidez was smoking weed and hanging out too when defendant arrived at Blanco's house. From Blanco's bedroom, Chaidez overheard defendant tell Blanco that he had "popped somebody." When Blanco asked defendant where this occurred, defendant looked around the room. Upon seeing Chaidez in Blanco's room, defendant said, "Don't worry about it."

¶ 14      Detective Michelle Wood was assigned to investigate the murder of Mr. Sandoval.
On January 17, 2014, she interviewed Chaidez, who denied knowing anything about the shooting and claimed to have been on her phone at her residence when the shooting occurred.

¶ 15      Chaidez testified that she did not tell Detective Wood what she witnessed on December 12, 2013, because she was afraid and her husband had told her to mind her own business. After talking with a family member who told Chaidez that she needed to do "the right thing" and "not to let anybody put fear in my heart," however, she "felt more comfortable and confident" that she "needed to do the right thing." On December 14, 2014, she told the police what she had witnessed a year earlier and identified both defendant and Johnson from separate photo arrays. Chaidez also viewed a video taken from the Marble Bar and recounted what was depicted on it.

¶ 16      Chaidez also viewed People's Exhibit #13, a videotape taken from the Marble Bar. This exhibit, which was admitted in evidence without objection, contained two clips that captured

the shooting of Mr. Sandoval. Chaidez testified that contents of the videotape truly and accurately depicted what Chaidez witnessed the night of the shooting.[2]

¶ 17      Detective Wood, on the other hand, testified that when phone records did not substantiate Chaidez's claim that she was in her apartment at the time of the shooting, Detective Wood confronted Chaidez with this fact. At this point Chaidez said that "King Crazy" was the shooter. Using the nickname, Detective Wood was able to identify "King Crazy" as defendant, Mario Ortega. In the same manner, Detective Wood was able to identify "Drizzy" as Joshua Johnson. Chaidez identified photographs of both Johnson and defendant from two separate photo arrays.

¶ 18      Defendant was arrested on May 7, 2015. That same day both Chaidez and Mangual spoke with detectives, and Mangual now told the officers what he knew as "it just felt like the right thing to do."

¶ 19      On May 15, 2015, after Joshua Johnson was arrested, he was repeatedly interviewed by Detective Wood. After initially denying that he touched the victim, Johnson was confronted with evidence in the possession of the police, including a videotape that captured the offense. After asking if he could get a deal in exchange for telling the police about the incident, Johnson implicated himself and defendant in this offense.

¶ 20      Johnson reached a plea bargain with the State. In exchange for his testimony, Johnson would be sentenced to 20 years in the Illinois Department of Corrections on a reduced charge of attempted armed robbery. Johnson had previous convictions for attempted residential burglary and residential burglary and was previously sentenced to four years' imprisonment in the Illinois Department of Corrections for both offenses in February of 2012.

¶ 21      Johnson testified about the events of the evening of December 11, 2013, into the morning of December 12, 2013. Defendant and Johnson had a longstanding friendship that began with their shared gang membership. The two would hang out once or twice a week. On December 11, 2013, defendant called Johnson and asked him to meet up at Mangual's house. Mangual, whose nickname was "DK," was also a Latin King. Mangual lived at Spaulding Avenue and Armitage Avenue, and Johnson had been to his home before.

¶ 22      Defendant told Johnson that he was going to bring his handgun to Mangual's house. Johnson arrived at Mangual's house at 7 or 8 p.m. Over the course of the evening, Johnson made three trips to the liquor store, located at Kedzie Avenue and Armitage Avenue, to purchase bottles of Hennessy. The group was drinking and smoking weed.

¶ 23      At one point in the evening, Johnson saw defendant place a handgun, described by Johnson as a black, .9-millimeter High Point, on a table in DK's house. Defendant began talking about his dad passing away in a drunk driving accident. Defendant was "emotional" and "angry" and said that the drunk driver was locked up, but that defendant was going to try to do something to "the guy's" family.

¶ 24      Accompanied by defendant, Johnson went outside to the middle of the "T-alley" between Kimball Avenue and Spaulding Avenue to smoke a cigarette. While the two were outside, defendant took off running towards someone walking on Spaulding Avenue. Johnson ran after defendant. When Johnson caught up with him, defendant had crossed to the other side of

_____

[2]The videotape of the shooting has been included in the record on appeal and has been reviewed by this court.

Spaulding Avenue and was jumping on a man's back. At first, Johnson thought that it might be a rival gang member, since they were in Imperial Gangsters' territory. While defendant's body was covering the top half of the man's body, Johnson testified that he grabbed the man's legs, "just because, you know, he was just doing something, so I was doing it, too."

¶ 25 Johnson heard the man screaming and got close enough to him to realize that the man was old. At this point, Johnson knew that the man was not a rival gang member. Johnson stopped and said, "King, you tweeking," meaning, "being stupid, acting crazy." Johnson saw defendant "up his gun and cock the gun, so when he did that, I seen the look in his eyes, and I knew what was going to come next, so I tried my best to stop him and pull him away." Johnson knew that defendant was going to kill the man, so Johnson tried to pull defendant off of him, "[b]ecause dude didn't do nothing to deserve this. I just didn't want it to go no further."

¶ 26 Defendant resisted Johnson's efforts. Although Johnson managed to pull defendant away, defendant shot the old man. As Johnson ran, he saw defendant continue shooting the old man.

¶ 27 Johnson testified that he went back to Mangual's building. He was sitting in the stairwell when defendant came up the stairs, panting and laughing, and said, "I got him, I got him." Johnson and defendant then went back inside Mangual's apartment, and Johnson

> "came out of shock a little bit, I got mad, I told him—you know, I pushed him up against the refrigerator, I told him why you do that for, you tweeking, why the f***— why you just do that, you know what I'm saying, you involved me in that s***, you tweeking."

Defendant replied, "we cool, King, we cool, I got him, cool."

¶ 28 According to Johnson, at this point Chaidez returned home and was acting shocked, saying that someone just got killed and that his body was outside. Defendant was "saying little indirect stuff in front of old girl, in front of Jessica, you know, basically trying to take ownership of what happened, you know what I'm saying, that he wanted everybody to know what he did, like some drunk stuff."

¶ 29 When Chaidez went to the bedroom, Johnson told defendant "you tweeking, you saying this stuff in front of old girl, Jessica, and she mess around with the whole Humble Park [*sic*],she going to have the whole park knowing this s*** and she going to involve me." Johnson testified that defendant then asked Johnson whether he wanted defendant to kill Chaidez. Johnson called his girlfriend, who picked him up ten minutes later. Johnson testified that defendant was still in the apartment when Johnson left.

¶ 30 The parties stipulated that if called to testify, Detective Wood would testify that on December 14, 2014, Chaidez told the detective that she saw both "Crazy" and "Drizzy" beating the victim about the body while trying to rob him. The victim continued to fight back, and Johnson started walking away when defendant walked up to the man and shot him. Chaidez saw the man fall to the ground. Chaidez never told Detective Wood that Johnson tried to pull defendant off of the victim.

¶ 31 The defendant asserted a defense of alibi. He called Lavedia Rice to testify on his behalf. Rice, a computer tech for the Cook County Board of Elections, testified that she considered defendant to be her godson. Defendant stayed with Ms. Rice every day unless her sister came home, and then he would have to go to his residence. Ms. Rice testified about the events of the evening of December 12, 2013, into the morning of December 13, 2013.

¶ 32    Rice testified that she saw defendant at 4 or 5 p.m. at her home at 1059 North Springfield Avenue. Rice's niece, Keyana Ford, who also went by the name of Cayla Ford, joined them at some point. Cayla and Mario had a sexual relationship that was conducted at Rice's house. Cayla, defendant, and Rice spent the evening of December 12, 2013, outside talking and laughing. At about 11:30 p.m., the three went inside and sat on the couch talking and watching television. Then defendant and Cayla went to sleep in Ms. Rice's sister's room. Rice stayed up until about 2 a.m., watching television in a front room. Neither defendant nor Cayla came out of the bedroom. Rice fell asleep on the couch.

¶ 33    Early the next morning, Rice heard Cayla and defendant having sex. At about 7 a.m., Rice's sister came home and said that defendant and Cayla had to leave her bedroom. Defendant went to the store to get supplies for breakfast and did not return. Rice heard that defendant was locked up later that day. When it became apparent that Rice's testimony related to the day preceding the murder, Rice testified that she did not recall what day of the week December 12, 2013, was and that defendant was also with her on December 11, 2013.

¶ 34    Defendant testified that on the evening of December 11, 2013, he was with Lavedia Rice and Cayla Ford, whom he "was messing with at the time." Defendant remained at Rice's house the whole night. At 11:30 or 11:40 p.m. the three went inside and smoked for 20-30 minutes, after which time he and Cayla had sex until 7 or 8 a.m. the following day. Rice's sister, Shakema Taylor, kicked defendant and Cayla out of her room the next morning. After washing up, defendant went to the store to buy eggs for Rice. Before doing so, defendant "was up and down the block selling drugs." Defendant had started selling drugs at the end of February of 2013 because his dad passed away and he needed income to help his mother who was also hurt in the accident.

¶ 35    Defendant worked the block for three to four hours. When he was walking to the corner liquor store, he was arrested for "manufacture delivery of heroin" at approximately 3:50 p.m. on December 12, 2013.

¶ 36    Defendant denied being at Mangual and Chaidez's house the night of December 11, 2013, into the early morning of December 12, 2013, or having anything to do with the death of the victim. Defendant also denied being at the party at Blanco's house the following day.

¶ 37    On cross-examination, defendant admitted that when he was arrested, he did not tell the police that he was with Cayla at the time of this offense because he did not have a serious relationship with her and she had stopped talking to him. Defendant and Johnson were both Latin King gang members, but the two were not friends. Defendant knew Mangual and did not have a "beef" with either him or Johnson.

¶ 38    In rebuttal, the State recalled Detective Wood, who testified that defendant told her that he stayed at his place or on Madison with someone named Keema. Defendant was unable to provide Keema's last name or age. On the morning of December 12, a man whose name began with an "A" awoke defendant. Defendant did not mention anyone else being at the residence or say anything about buying eggs.

¶ 39    Defendant testified in surrebuttal that Keyma was Rice's sister and that her real name was Shakeyma Tate. She was a friend of defendant's, and he "might mess around with her."

¶ 40    At the conclusion of the evidence, the trial court made the following findings:

"COURT: Court has listened carefully to the evidence in this case, listened carefully to the well stated arguments of the attorneys and compliment the attorneys for the manner in which they represented their respective clients.

It's clear that the attorneys have an excellent understanding of the facts from a legal issues in the case, well prepared, well versed in connection with the issues in the case, and I thank the attorneys for the manner in which they've conducted themselves.

It doesn't warrant commenting on what a tragedy this is for Mr. Sandoval and his family, so I won't.

The question of whether or not Mr. Ortega's proved guilty beyond a reasonable doubt or not of Counts 9 and 10, the first degree murder counts, clearly pins on the Court's conclusion regarding witnesses Jessica Chaidez or Chaidez, Angel Manguin—Mangual, excuse me, and Joshua Johnson.

The Court is, with respect to Mr. Johnson, well versed with the legal precepts that someone who is alleged to have committed or been involved in a crime at issue, the testimony has to be looked at with extreme caution, and the Court does just that. Curious circumstance that all three of these witnesses whose testimony purports to implicate Mr. Ortega sees so many of the aspects of the event and things that take place before and after the event from different [perspectives].

Miss Chaidez sees these persons at her house, I believe, when she goes out for a girl's night out, as she terms it, and claims to have called her husband and wants them out by the time she gets home, perhaps because she isn't all that [enamored] with them or perhaps because she wants to spend some quality time with the man in her life.

Angel Mangual—and she is the one who claims to have seen this from the [perspective] of her car upon arrival back in the area of her home coming home from this girl's night out.

Angel does not see the event take place. He hears a shot and then more shots, is with he claims Mr. Johnson and Mr. Ortega before the fact and claims to see both of them after the fact.

Now, Mr. Johnson completely different [perspective], that of a seeming offender.

And Mr. Fulton has done an excellent job seeking to impeach their testimony, and they are impeached. Just to say they are impeached doesn't mean that the Court doesn't believe them, I'll talk about that in a bit. But it means that there are circumstances that could indicate that they are not telling the truth because they say things that are different, both different from one another, perhaps, different from what they may have told the police.

For example, it appears that when Jessica comes back, at least by virtue of my review of her testimony, my independent recall, my review of my notes, she doesn't appear to see these individuals in her home, she says nothing about these individuals being in her home; although both Angel and Joshua testified that they were in Jessica and Angel's home, in the apartment, after the event, giving rise to Mr. Sandoval's death.

Angel and Joshua described perhaps differently what purportedly gets said by Mr. Ortega after the fact in which he explained—Mr. Ortega explained to me that he went out and shot an IG, an Imperial Gangster, and Mr. Ortega says—Mr. Mangual says it

is what it is, but you got to leave, presumably because he believed Jessica was on her way home, although according to Mr. Johnson, Jessica was home. Because Mr. Johnson testified that after this took place, he went back to Angel's home, who's sitting on the steps. Mr. Ortega came up panting, laughing, saying I got him, I got him. We went into Angel's kitchen, which again is perhaps inconsistent with Miss Chaidez' claim that either of these individuals both took off southbound away from the apartment towards Wabansia or as she seems to have told the police at some other point maybe in December of 2014 or in January of 2014, somebody ran down the alley, somebody ran down southbound down Spaulding.

But in any event, Mr. Johnson claims that Miss Chaidez came in while they were both there. Mr. Ortega was saying stuff, he was not real clear on what it was, he called it indirect, indirect things or indirect stuff about how he did it in, meaning killed Mr. Sandoval, in Miss Chaidez' presence.

So these details regarding what these three individuals say are somewhat [disparate] with respect to what precisely happened after Mr. Sandoval was executed. But at the same time, the Court has to look at that in the context of the fact that Miss Chaidez does not acknowledge to the police until fully one year later what it was that she witnessed happened, even though she had been interviewed before then, I guess about a month or two in January of 2014 after the murder in 2000—December of 2013.

Mr. Johnson in turn is not interviewed by the police until May of 2015, fully a year after what had happened. And the impeachment that I just recounted, the details, the claimed details regarding what happened after Mr. Sandoval was executed pales in comparison to the enormity of what Jessica and Joshua Johnson observed when Mr. Sandoval was executed. And I would note that what they observed is confirmed in pretty every regard by the serendipitous video from two [perspectives] gleaned from the security or surveillance cameras belonging to the Marble Bar.

As Mr. Johnson described, the offender, the person who executed Mr. Sandoval, came up from behind him, began fighting with him, began struggling with him. Mr. Johnson figured it was some kind of gang business from his [perspective], gang silliness from my [perspective], which makes sense because Johnson would have had a [perspective] of Mr. Sandoval at the outset from the rear and would have no knowledge of precisely who Mr. Sandoval was at the outset, coupled with the fact that they had been drinking Hennessy and smoking dope all night long. But he goes to the ostensible purposes, he acknowledges of looking to help his fellow gang member exact something against some seeming gang rival. But it's clear from the video that when Johnson realizes that the 68-year-old Mr. Sandoval is not someone who is in the gang game, he immediately ceases his actions directed towards Mr. Sandoval whether it was patting him down by the waist or grabbing him by the legs, all of which is of no moment frankly. And clearly looks to pull the offender, the murderer off of Sandoval because he knows that that person has no—that there's no reason to attack that person in that manner, and that person shouldn't be attacked in that manner.

Miss Chaidez is seeing the same thing albeit from a different [perspective], across Spaulding, a little bit down the street, in her vehicle. Mr. Fulton gamely, and I mean gamely, expertly, wants me to think that she can't see from that [perspective] passed the cars because Mr. Sandoval is knocked down, the offender and Johnson are on top

of him on the ground. That ignores the fact that these cars all seem to have been typical sedans with large windows. I have no doubt at all that Miss Chaidez would be able to see through those windows at that time or through those cars, everything she claims to have seen. I listened to her testimony and found it to be credible. She had every opportunity to observe what was happening, I believed her testimony while she recounted it, I don't want to say in a manner or matter of fact way, but in a natural way that bespoke telling a story in a credible manner because it was actually what she had witnessed and not what she was spoon-fed by anybody or—and not what she may have made up.

I believe that her testimony and Mr. Johnson's testimony recounting their claim that Mr. Ortega was the person who shot and killed Mr. Sandoval, was credible. I believe also the testimony of Mr. Mangual regarding how it was that Mr. Ortega came back into his home and told me, told Mangual that he, Ortega, just shot an IG, an Imperial Gangster was credible.

Mr. Ortega's testimony and Miss Rice's testimony is not credible, substantially contradicted by the testimony of Sergeant Wood and the video interrogation of Mr. Ortega regarding how he wasn't with someone named Cayla, he was with someone named Keyma, perhaps, he was woken by a stranger. This whole scenario about waking up and remembering this morning because we didn't have any food in the house and Mr. Ortega had to go out and get us food, doesn't make any sense because he never came back. It's simply beyond incredible, not to mention the fact that Cayla, herself, didn't testify, there's no testimony regarding why that was or where she was. Miss Rice was available to testify. You would certainly anticipate that the person who was supposedly having sex with Mr. Ortega at the time Mr. Sandoval was murdered would have been able to come in and testify. The fact that she didn't is one more reason why I do not believe the alibi, or the testimony proffered in support of.

I do believe that the State has presented testimony sufficient beyond a reasonable doubt to prove Mr. Ortega guilty. I'm going to enter a finding of guilty on Counts 9 and 10, the finding will merge into Count 9. The bond will be revoked, set a no bail, which may be a moot point, P.S.I. will be ordered."

¶ 41 At the sentencing hearing that followed, in aggravation, the People presented a victim impact statement from the victim's daughter, Elvira Sandoval. Defendant's criminal history was presented. Defendant had a juvenile conviction for a 2009 aggravated discharge of a firearm, for which he was initially sentenced to two years' probation. Defendant was subsequently committed to the Juvenile Department of Corrections on that charge in 2011. As an adult, defendant was sentenced to 18 months' probation for a 2013 Class 4 aggravated driving under the influence of alcohol conviction. His probation was terminated unsatisfactorily on this case. Defendant was also convicted of first degree murder in case number 14 CR 2643, for which he received a 55-year sentence.[3]

¶ 42 The State noted that defendant was subject to a mandatory sentence of natural life imprisonment pursuant to section 9-1(b)(3) of the Criminal Code of 2012 (720 ILCS 5/9-1(b)(3) (West 2012)).

---

[3]Defendant's conviction in this case was affirmed on appeal in *People v. Ortega*, 2021 IL App (1st) 172007-U.

¶ 43    The court then inquired about the order in which this murder and the unrelated murder in case No. 14 CR 2643 were committed, as well as defendant's age when each of the murders were committed. The parties agreed that the murder in 14 CR 2643 was committed when defendant was 18 years old, while the murder in this case was committed when defendant was 19 years old.

¶ 44    In mitigation, defense counsel stated:

> "DEFENSE COUNSEL: ***
>
> Just that we object to the natural life sentence would be a violation of the 8th Amendment, prohibition against cruel and unusual punishment.
>
> Your Honor is pointing out, my client was very young, 18 and 19 at the—at the time of these incidents; and based on that, Judge, we object to a natural life sentence being imposed; and we have nothing to argue beyond what is indicated in the Presentence Investigation, Judge."

¶ 45    The presentence investigation report (PSI) indicated that defendant's date of birth was July 29, 1994. Defendant was born to the union of Mario Ortega Sr. and Silva Cedomio. Defendant had a close relationship with his father, who died in 2013. Defendant had a good relationship with his mother, who was shocked and saddened by his arrest but remained supportive of him. Defendant also had a good relationship with his four siblings.

¶ 46    Defendant was raised by his parents in the Humboldt Park neighborhood, where he had a good childhood and a stable and loving family home. Defendant was not abused or neglected, and the family was not involved with the Department of Children and Family Services. Defendant's father was involved with the criminal justice system. No one in defendant's immediate family struggled with substance abuse.

¶ 47    Defendant was an average student who got along well with teachers and other students. Defendant did not attend any special education programs for learning or behavior issues. Defendant stopped attending North Grant High School in Chicago when he was incarcerated in 10th grade. Defendant intended to obtain a GED.

¶ 48    Defendant was employed from June of 2012 until his incarceration in December of 2013 by Car Star, packing pallets for shipment. Defendant got along well with his supervisor and coworkers.

¶ 49    Defendant was in a relationship with Ruby Romero for the past three years. Defendant had one child, age seven, with Rosie Aldama and one child, age five, with Brianna Ruiz. Prior to his incarceration, defendant saw his children once or twice a week. Defendant denied being a victim of domestic violence or having any domestic violence cases in his background.

¶ 50    Prior to his arrest, defendant lived with his mother and siblings at 5409 W. Drummond Avenue in Chicago. Before being incarcerated, defendant enjoyed playing soccer, going to the movies, and shopping. Most of defendant's free time was spent with his children.

¶ 51    Defendant was affiliated with the Latin Kings street gang between the ages of 14 and 18. Defendant had four close friends who were stable, supportive, and a good influence on him.

¶ 52    Defendant was in good health, not under the care of a doctor, and not taking any prescription medication. Defendant was never treated for any serious illness or disease. Defendant was never diagnosed with a psychological, learning, or behavior disorder. He was never treated by a psychiatrist, psychologist, or mental health professional and was never ordered to undergo a behavioral clinical exam.

¶ 53      Defendant first used alcohol at age 15. He began drinking three glasses of hard alcohol once a week at age 16. By age 18, defendant's alcohol consumption decreased to two glasses of hard alcohol once a month. The last time that defendant consumed alcohol was in September of 2013. Defendant's mother expressed concern about his alcohol use. At age 16, defendant began smoking one "blunt" every other month. At age 18, defendant stopped using marijuana because it made him too tired.

¶ 54      While on juvenile probation, defendant attended drug classes on a weekly basis for three months, and while incarcerated in the Juvenile Department of Corrections, he attended group meetings twice weekly for six months.

¶ 55      Defendant had no problems with his interpersonal relationships; no difficulties eating, sleeping, or concentrating; and no anxiety or stress.

¶ 56      In imposing sentence, the court ruled as follows:

> "THE COURT: Thank you, everyone. I would note that I asked questions regarding the timing of these murders; and the age of Mr. Ortega at the time of these murders; and it does appear to me, that he was 19 years old at the time of this murder, committed on December 12, 2013; and he would have been 18 years old when the June, 2012 murder litigated under 14-CR-2643 was committed.
>
> And the reason I—I inquired about that is that strictly speaking, Mr. Ortega's circumstances not governed by Miller versus Alabama and it's progeny, there is no Illinois caselaw to the effect that—that I'm aware of—that a natural life sentence of someone who is over the age of—or 18 or over, is violative of the 8th Amendment to the Constitution.
>
> But there is a caselaw—at least two cases that I'm aware. One of which is now pending in front of the Illinois Supreme Court on a Petition for Leave to Appeal.
>
> It's People versus Harris, 2016 IL App 1st 141744, as well as People versus Howse, 2015 IL App 1st 11580.
>
> Those were two cases—well, Howse was a case where a 19-year-old Defendant was the lookout for a double murder, received a natural life sentence; and the Appellate Court in that case, ruled not that that was violative of the 8th Amendment of the Federal Constitution, but ruled that that life sentence violated the proportionate penalties clause of the Illinois Constitution.
>
> Similarly, People versus Harris is not a natural life case; but it was a case where an 18-year-old Defendant received minimum consecutive sentences, totaling 76 or 78 years for murder and attempt murder—76 years I believe.
>
> And that that mandatory minimum sentence, even for an 18-year-old, violated the proportionate penalties clause because it—not because it constituted a *de facto* life sentence. Perhaps the Court may have used that term; but under the circumstances there, that Court believed that the sentence was improper; and our Illinois Supreme Court will say whether that's correct or not correct.
>
> But our Illinois Supreme Court has stated in People versus Holman, H-O-L-M-A-N, 2017 IL 120655, that even for persons under the age of 17, discretionary natural life sentences are not necessarily inappropriate, where a Trial Court determines that a Defendant's conduct shows irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.

And though a similar claim as is made by Mr. Fulton, now, is made in a case called People versus—I'm smiling, because it was my case. I presided at the Trial—Denzel Williams. I don't have the cite at hand—at hand.

That's a case where an individual killed three people; and he was 18 years old, his 17-year-old girlfriend, her crippled Mother, and her 11-year-old Sister, by stabbing them repeatedly.

That natural life sentence was upheld in the face of a similar argument by Mr. Fulton at this time, under the particular circumstances of this case, and an opinion written by Justice McBride.

I mention this because I have considered Mr. Fulton's argument. I also anticipated it. That's why I took a break, to get out and get my notes on the cases I have just listed.

I would note in this particular instance, both with respect to this case and with respect to the case that I have an independent recollection of, the 2014 matter, adjudicated in 2017, that matter involved an instance where Mr. Ortega, for reasons that might relate to jealousy, possessiveness, lurked in hiding, and manufactured circumstances to get the victim in this case, to appear in an alley, in a gangway, for the ostensible purpose of selling some Marijuana.

The victim was a low-level Marijuana dealer, you could describe him as; and Mr. Ortega in a cold-blooded manner, killed him because that person was, quote, guilty, unquote, of selling Mr. Ortega's paramour, some small amount of Marijuana earlier in the day.

Inexplicable—I shouldn't say inexplicable. I did explain just now why he did it; but a motive for murdering somebody that is difficult to comprehend or countenance. That's similarly the case here. We've got Mr. Sandoval in this matter, fantastically admirable man, married for a long, long time, raising a family, under the impact statement, shows under challenging circumstances, both with respect to his—his occupation, his Wife's not working, and mental health challenges regarding several of his children; but he made an excellent go of it.

He did so with humility, dealt this with grace, working late hours, winter evenings, tramping through the snow, just to get home to that paradise that he considered his home, his castle.

Mr. Ortega, initially, so far as can be ascertained, believing that person from behind to be some rival gang member, jumped on him, begins beating him. Mr. Johnson joins in. The obvious purpose as he testified to, of engaging in this attack on this seeming and fellow—not fellow, but rival gang member.

Mr. Johnson figured it out pretty quick. Mr. Sandoval was nothing of the sort. He was as Mr. Johnson realized, an older man on his way somewhere; and actually took the affirmative step of seeking to pull Mr. Ortega off of Mr. Sandoval, because Mr. Sandoval wasn't what they thought he was.

Either Mr. Ortega didn't make that realization or didn't care, because as was clear from the videotape, he produced a gun, and fired it at Mr. Sandoval, in his back, while he was down on the ground, cold blooded, heartless, without compunction, without hesitation.

And I can appreciate that those things happen sometimes, with the whip saw of adrenaline, and machismo that sometimes seems to accompany people who are motivated by gang royalties and gang membership.

But even if that had been the case, you would expect that that would have dissipated quickly, with the realization of, A, what had occurred, and, B, who it had occurred to; but it didn't.

Mr. Ortega went into Angel and Jessica's residence with Joshua Johnson, conversations were had that were testified to at Trial. Those conversations may not have been heard by Miss Chaidez.

Mr. Johnson cautioned Mr. Ortega about speaking—or out of school, so to speak, in Miss Chaidez's presence or in her purview, because of her lack of gang membership, because Mr. Johnson's fear that she would not tow any gang line.

And Mr. Ortega's response—which I believe that Miss Chaidez testified to—Mr. Ortega's response was to inquire, should I kill her?

Thus evincing in my mind, our Supreme Court, and the United States Supreme Court, characterizes this as irretrievable depravity, permanent incorrigibility, and frankly, irreparable corruption that relies beyond the possibility of rehabilitation.

So notwithstanding Mr. Fulton's well-stated arguments, notwithstanding the potential applicability of People versus Harris and People versus Howse, I don't believe the analysis—analyses in those cases lie in this instance.

I instead believe, that as is required by our Legislature in Section 5-8-1-A (1) (C) (ii), as Mr. Ortega had attained the age of 18 years when he committed each of these murders, he is properly sentenced to a natural—a sentence of natural life in the penitentiary, without parole; and he will be so sentenced in Count IX. Count X will merge into Count IX."

¶ 57 On October 18, 2018, defendant filed a timely motion to reconsider sentence, which alleged that (1) his sentence was excessive, (2) the court improperly considered as aggravation matters that were implicit in the offense, and (3) his natural life sentence violated the eighth amendment's prohibition against cruel and unusual punishment. Following the trial court's denial of defendant's motion, defendant filed a timely notice of appeal.

¶ 58                                    II. ANALYSIS
¶ 59                           A. Prior Consistent Statements
¶ 60 In his first assignment of error, defendant maintains that multiple improper prior consistent statements were erroneously admitted at trial. As a general matter, proof of a prior consistent statement made by a witness is inadmissible hearsay when used to bolster a witness's testimony. *People v. Heard*, 187 Ill. 2d 36, 70 (1999). Prior consistent statements are admissible, however, to rebut a charge or an inference that the witness was motivated to testify falsely or that their testimony was of recent fabrication where the witness told the same story before the motive came into existence or before the time of the alleged fabrication. *People v. Williams*, 147 Ill. 2d 173, 227 (1991). The codification of this rule is found in Illinois Rule of Evidence 613(c) (eff. Sept. 17, 2019), which provides:

"(c) Evidence of Prior Consistent Statement of Witness. Except for a hearsay statement otherwise admissible under evidence rules, a prior statement that is consistent

with the declarant-witness's testimony is admissible, for rehabilitation purposes only and not substantively as a hearsay exception or exclusion, when the declarant testifies at the trial or hearing and is available to the opposing party for examination concerning the statement, and the statement is offered to rebut an express or implied charge that:

　　(i) the witness acted from an improper influence or motive to testify falsely, if that influence or motive did not exist when the statement was made; or

　　(ii) the witness's testimony was recently fabricated, if the statement was made before the alleged fabrication occurred."

¶ 61　　The parties initially disagree as to the correct standard of review. Defendant relies on *People v. Krueger*, 175 Ill. 2d 60 (1996), to support his contention that *de novo* review is appropriate, while the State maintains that this claim should be subject to the abuse of discretion standard of review.

¶ 62　　We agree with the State. Unlike *Krueger*, which concerned a circuit court's ruling on a motion to quash arrest and suppress evidence on a pure question of law, this case concerns a fact-based question relating to the admissibility of trial testimony. "We will not reverse a trial court's evidentiary ruling on a prior consistent statement absent an abuse of discretion." *People v. House*, 377 Ill. App. 3d 9, 19 (2007). Thus, the abuse of discretion standard of review applies to this claim.

¶ 63　　Further, while conceding that this claim is forfeited, defendant nevertheless seeks review under both prongs of the plain error doctrine or, in the alternative, as a claim of ineffective assistance of counsel. A defendant who fails to preserve an issue in a posttrial motion forfeits review of such issue unless he can establish plain error. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Under the plain error doctrine, we may consider a forfeited claim when

"(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 64　　Insofar as we consider whether the plain error review is warranted with respect to defendant's multiple claims of error, we reject defendant's contention that second prong plain error review is appropriate. We do not interpret either *People v. Smith*, 139 Ill. App. 3d 21, 34 (1985), or *People v. Wheeler*, 186 Ill. App. 3d 422, 427-28 (1989), as invoking second prong plain error review where both cases speak directly to the prejudice that resulted from the admission of the prior consistent statements in these cases. Structural errors are recognized in a very limited class of cases, including a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, and a defective reasonable doubt instruction. *People v. Thompson*, 238 Ill. 2d 598, 609 (2010). The admission of a prior consistent statement is not a structural error where it does not necessarily render a trial fundamentally unfair or unreliable in determining guilt or innocence.

¶ 65　　Our conclusion finds support in *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104. In *Stull*, the defendant claimed that prior consistent statements were erroneously admitted at trial to bolster the complaining witness' credibility. In contrast to this case, the defendant's claim was fully preserved. On appeal, the defendant alleged that the "harmless beyond a reasonable

doubt" standard articulated in *Chapman v. California*, 386 U.S. 18, 24 (1967), should be utilized in deciding the defendant's claim. The appellate court disagreed, finding that "the normal evidentiary standard of review should be applied to such errors." *Stull*, 2014 IL App (4th) 120704, ¶ 104. The court clarified that the "normal evidentiary standard" is the "reasonable probability standard." (Internal quotation marks omitted.) *Id.*

¶ 66 Where the *Chapman* standard of review does not apply to a fully preserved claim of error concerning improperly admitted prior consistent statements, it would defy reason for us to accord that same error second prong plain error status when that claim is forfeited. Thus, to the extent that we review for plain error, we consider whether defendant has established a clear or obvious error and whether the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant. *Piatkowski*, 225 Ill. 2d at 565.

¶ 67 For reasons that will be clarified, we review for first prong plain error the statements made by Chaidez and Mangual and separately consider whether the admission of Johnson's testimony as to his prior consistent statement deprived defendant of the effective assistance of counsel.

¶ 68              1. Chaidez's and Mangual's Alleged Prior Consistent Statements

¶ 69 Defendant complains that Chaidez and Mangual improperly testified as to what they told each other about the murder and as to what they told the police approximately one year later.

We agree with the State that such testimony did not violate the prohibition against prior consistent statements but were properly admitted statements of identification. Section 115-12 of the Code of Criminal Procedure of 1963 provides:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2018).

¶ 70 That prior statements of identification are not regarded as hearsay finds further support in Illinois Rule of Evidence 801(d)(1)(B) (eff. Jan. 1, 2011), which provides:

> "(d) Statements Which Are Not Hearsay. A statement is not hearsay if
>
> (1) Prior Statement by Witness. In a criminal case, the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is
>
>                          * * *
>
> (B) one of identification of a person made after perceiving the person."

¶ 71 Thus, the general rule prohibiting testimony of prior consistent statements by witnesses does not apply to statements of identification. *People v. Shum*, 117 Ill. 2d 317, 342 (1987). Furthermore, our supreme court has held that a statement of identification includes the entire identification process. *People v. Tisdel*, 201 Ill. 2d 210, 219 (2002).

¶ 72 In *People v. Newbill*, 374 Ill. App. 3d 847, 851 (2007), the court considered the propriety of a police officer's testimony regarding a witness's description of the defendant that enabled the police to discover the defendant's identity. The court concluded that the officer's testimony as to what the witness told him was a properly admitted statement of identification. *Id.* at 853.

¶ 73 In *People v. Temple*, 2014 IL App (1st) 111653, ¶¶ 30, 41, the court rejected the defendant's claim that multiple prior consistent statements were improperly admitted at trial.

The court found that the police and civilian testimony relating to steps taken in the identification process did not violate the prohibition against the admission of prior consistent statements but were properly admitted statements of identification pursuant to section 115-12 of the Code of Criminal Procedure of 1963. *Id.* ¶¶ 41-42.

¶ 74 *People v. Anderson*, 2018 IL App (1st) 150931, does not alter our conclusion. In *Anderson*, in addition to finding an error in the introduction of an unproven threat attributed to the defendant and reliance on that evidence by the State in closing argument (*id.* ¶¶ 27-28), the court also found an error in the introduction of testimony of a prior consistent statement (*id.* ¶ 36). The witness not only testified that he identified the defendant three days after the shooting but was also permitted to testify about his handwritten notes made on the photos that were used to identify the defendant. *Id.* The court found that the initial identification testimony was admissible, but that the handwritten notes were improperly prejudicial where they unfairly bolstered the trustworthiness of the witness in this closely balanced case. *Id.* ¶¶ 42, 47-48.

¶ 75 We likewise reject defendant's reliance on *People v. Miller*, 302 Ill. App. 3d 487, 493-94 (1998), to support his claim that "improperly admitting even a single prior consistent statement is reversible error if this Court cannot say beyond a reasonable doubt that the improperly admitted evidence did not affect the outcome of the trial."

¶ 76 In *Miller*, the murder victim's six-year-old daughter testified that she saw her father with a gun but, on cross-examination, denied that she saw the gun and claimed not to know what a gun looked like. *Id.* at 490. Over objection, the State was permitted to call a detective to testify to the daughter's prior consistent statement to rebut an implied charge of recent fabrication or as a prior inconsistent statement. *Id.* at 490-91.

¶ 77 *Miller* is factually and procedurally inapposite. In this bench trial, Chaidez and Mangual's testimony regarding what they said to each other and what they told the police was properly admitted at trial. We note that neither Chaidez nor Mangual did more than make passing reference to telling each other what they observed and knew and eventually relating the same to the police. No details were repeated by either and the State did not rely on any of this testimony to bolster their credibility. The testimony was elicited to establish how defendant wound up being identified by Chaidez and Mangual.

¶ 78 Procedurally, defendant's reliance on *Miller* is misplaced where he never objected to the admission of Chaidez or Mangual's testimony as being inadmissible prior consistent statements. As such, it is incumbent on him to establish both a clear error and resulting prejudice. He has shown neither.

¶ 79 In addition to not establishing a clear error, the evidence in this case was not closely balanced. This offense was recorded on videotape, and while the videotape did not independently establish the identity of either individual depicted, the trial court's extensive factual findings directly undercut defendant's claim to the contrary. The testimony of both Chaidez and Johnson dovetails with what is revealed on the videotape. While it is unquestionably true that the witnesses provided widely varying accounts of this event, and failed to come forward when this murder occurred, the trial court specifically considered those inconsistencies and found that the witnesses were all impeached yet determined that this did not undermine the evidence of defendant's guilt. We have reviewed the testimony and the videotape and agree with the conclusions drawn by the trial court.

¶ 80 In conclusion, defendant has failed to establish that the testimony of Chaidez and Mangual resulted in any prejudice where the evidence in this case was not closely balanced. In the

absence of any such showing, defendant's claim of ineffective assistance of counsel must fail as a matter of law. See *People v. White*, 2011 IL 109689, ¶ 133.

¶ 81    We make one final observation. Chaidez's and Mangual's accounts of what they said to each other the following day was also not hearsay where not admitted for the truth of the matter asserted. A reviewing court may affirm on any basis in the record. *People v. Pankhurst*, 365 Ill. App. 3d 248, 258 (2006).

¶ 82    Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *People v. Kliner*, 185 Ill. 2d 81, 150 (1998). A statement offered for some reason other than to prove to the truth of the matter asserted is generally admissible because it is not hearsay. *People v. Evans*, 373 Ill. App. 3d 948, 964 (2007).

¶ 83    When a statement is offered for the purpose of showing its effect on a listener or to explain the listener's subsequent course of conduct, it is not hearsay. *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 76. In *Sangster*, the defendant objected to the admission of a witness's prior statements regarding his conversation with the victim wherein the victim identified the defendant as the shooter. The trial court ruled that the statement was not admitted for the truth of the matter asserted but to establish the witness's state of mind. *Id.* ¶ 73. The appellate court affirmed, finding no abuse of discretion in the admission of such testimony to explain the witness's course of conduct. *Id.* ¶ 78.

¶ 84    Chaidez and Mangual's accounts of what they told each other were not admitted to prove the truth of the matter asserted; indeed, as stated previously, they never even specified precisely what each said to the other. The import of this testimony was clear, where it was established that Chaidez and Mangual agreed not to disclose what they knew, but to "mind their own business." That the court understood this to be the case is borne out by its factual findings.

¶ 85                        2. Johnson's Alleged Prior Consistent Statement

¶ 86    Defendant also challenges the propriety of Johnson testifying that immediately upon being questioned, he provided the same account of the murder to Detective Wood as the account that he testified to at trial. Unlike the testimony of Chaidez and Mangual, we find this testimony not subject to review for plain error but only properly reviewed under the rubric of ineffective assistance of counsel. Our conclusion is based on what is plainly evident from this record: defense counsel did not simply fail to object to this testimony, but affirmatively relied on it in order to later impeach Johnson's credibility.

¶ 87    Plain error review only applies to cases involving procedural forfeiture, and not those that involve affirmative acquiescence. *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 29. Waiver involves the intentional relinquishment of a known right, whereas forfeiture is the failure to make a timely assertion of a known right. *People v. Phipps*, 238 Ill. 2d 54, 62 (2010). "In the course of representing their clients, trial attorneys may (1) make a tactical decision not to object to otherwise objectionable matters, which thereby waives appeal of such matters, or (2) fail to recognize the objectionable nature of the matter at issue, which results in procedural forfeiture." *People v. Bowens*, 407 Ill. App. 3d 1094, 1098 (2011). In determining whether a claim is waived, the court will examine the particular facts and circumstances of the case. *Phipps*, 238 Ill. 2d at 62.

¶ 88        Application of the foregoing principles to the facts of this case, which we will discuss in further detail, clearly supports the conclusion that counsel acquiesced to the admission of Johnson's prior consistent statement. This being said, we turn to the familiar test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694.

¶ 89        To establish deficient representation, defendant must overcome the strong presumption that the challenged inaction might have been the result of sound trial strategy. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). A reviewing court is highly deferential to trial counsel on matters of strategy and must make every effort to consider counsel's performance from his perspective at the time, rather than in hindsight. *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Trial counsel's failure to include a claim of improperly admitted prior consistent statement testimony in a posttrial motion is not the mark of ineffective assistance of counsel. *People v. Ramos*, 318 Ill. App. 3d 181, 187 (2000).

¶ 90        To establish prejudice, defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). If a claim can be disposed of based on an insufficient showing of prejudice, a reviewing court need not consider whether counsel's performance was deficient. *People v. Givens*, 237 Ill. 2d 311, 331 (2010). The prejudicial nature of the admission of a prior consistent statement is judged on a case-by-case basis. *People v. Henderson*, 142 Ill. 2d 258, 311 (1990).

¶ 91        Here, defendant has failed to satisfy either prong of *Strickland*. The record effectively undermines defendant's claim that trial counsel was deficient in not objecting to the admission of Johnson's testimony where it reveals that counsel used that testimony to effectively impeach Johnson.

¶ 92        The very first question asked by defense counsel was:

> "DEFENSE COUNSEL: Now, counsel asked you about your statement to the police from May 15, 2015 and you indicated you told the police at that time in your first statement exactly what you testified here today, is that correct?"

¶ 93        From this point on, trial counsel's searing cross-examination of Johnson laid the foundation for the impeachment that would follow. Johnson maintained that he was forthright in telling the police the truth right from the outset and that his statement mirrored what he testified to at trial. This included Johnson's account of briefly holding the victim's legs and his claim that he never participated in an attempted robbery.

¶ 94        Trial counsel effectively impeached Johnson in two ways, beginning with utilizing the videotape to show that Johnson did not hold the victim's legs but was situated near the victim's midsection. We have reviewed the videotape, and it does not support Johnson's claim that he held the victim's legs.

¶ 95        Next, trial counsel effectively impeached Johnson's testimony through his cross-examination of Detective Wood, who testified that Johnson gave multiple versions of his involvement in this crime, beginning with Johnson claiming to have never had physical contact

with the victim. It was only when Detective Wood confronted Johnson with evidence in her possession that Johnson admitted grabbing the victim around the hip area, but still denied going through the victim's pockets. Then, when Detective Wood told Johnson that the murder was captured on videotape and that it appeared as if Johnson was going through the victim's pockets, Johnson said that while initially it was not a robbery, he heard defendant say something like "b***, give me your money," and that Johnson was just "going with the flow."

¶ 96    Thus, counsel successfully established, contrary to the claim contained in his so-called "prior consistent statement," that Johnson was not forthcoming about the details of his involvement in this offense immediately upon being questioned by Detective Wood. In light of the foregoing, we find that defendant has failed to establish that trial counsel was deficient for not objecting to the admission of Johnson's prior consistent statement. It is clear that trial counsel's strategy was to use Johnson's prior consistent statement as a springboard for impeaching him.

¶ 97    Further, defendant fails to establish any resulting prejudice where we do not believe that the outcome would have differed had this prior consistent statement not been testified to. While defendant relies on *Henderson*, 142 Ill. 2d 258, to support his claim, we believe that *Henderson* actually undermines defendant's claim.

¶ 98    In *Henderson*, the State elicited a prior consistent statement when it asked a witness, " 'Anthony, did you tell the police officers that night essentially the same thing that [you're] telling the ladies and gentlemen of the jury?' " and the witness replied " 'Yes, something like that.' " *Id.* at 309. Defense counsel objected to the question but did not preserve the claim in a posttrial motion. *Id.* at 310. On appeal, as in this case, the defendant requested that the claim be reviewed for plain error or as an ineffective assistance of counsel claim. *Id.* at 310-11.

¶ 99    While finding that the testimony was an erroneously admitted prior consistent statement, the court determined that the evidence was not closely balanced and that the defendant failed to satisfy either prong of *Strickland*. *Id.* at 310, 312. With regard to the prejudice prong, the court found:

> "Admittedly, it is possible the jury saw Anthony as more credible because he said he had given the police the same account four days after the murder, and people are more apt to believe what is repeated. (See *People v. Smith* (1985), 139 Ill. App. 3d 21, 32.) But the prejudicial effect of this testimony was minimized by the fact that, unlike some cases relied upon by defendant where one witness corroborated another's testimony by testifying that the other made a prior consistent statement, here Anthony himself provided the evidence of his own prior consistent statement, and so his credibility was not truly enhanced; in other words, the jury would not have been inclined to attribute a great deal more credibility to Anthony's testimony because he had corroborated himself. (*Cf. People v. Emerson* (1983), 97 Ill. 2d 487, 499 (both police officer and witness testified that shortly after crime occurred witness identified defendants as perpetrators); *Smith*, 139 Ill. App. 3d at 31 (eyewitness to shooting testified defendant was perpetrator, and friend testified that shortly after shooting eyewitness told him the same).) Other circumstances also minimize the prejudiciality of this testimony: The testimony was general, not specific, in that Anthony said he told the police 'something like' what he had testified to; no portion of Anthony's statement to the police was admitted into evidence (*cf. Harris*, 123 Ill. 2d at 141 (witness' entire grand jury

testimony introduced)); and at no other time during the trial was there a reference, general or specific, to what Anthony told the police." *Id.* at 311-12.

¶ 100    In this case, Detective Wood's testimony refuted Johnson's testimony, as did the videotape. The admission of the prior consistent statement had no negative effect on the trial court as the trier of fact. In sum, we find that the admission of Johnson's prior consistent statement did not constitute ineffective assistance of counsel.

¶ 101                    B. Defendant's Request for an Evidentiary Hearing
                              Pursuant to *People v. Harris*

¶ 102    In his second assignment of error defendant alleges that he is entitled to an evidentiary hearing under *Harris*, 2018 IL 121932, for the trial court to determine whether the imposition of a natural life sentence is unconstitutional as applied to him. Defendant claims that such a hearing is necessary where the trial court failed to utilize the prescribed procedure for addressing an as-applied constitutional challenge. He alleges that the trial court made a finding of permanent incorrigibility without considering the "transient attributes" of youth. Instead, it relied on its personal opinion and evidence *dehors* the record and by misapprehending the trial evidence.

¶ 103    The State, on the other hand, maintains that *Harris* disallows the remedy sought by defendant. We agree with the State. Defendant's claim is entirely foreclosed by our supreme court's decision in *Harris*, 2018 IL 121932.

¶ 104    In *Harris*, the defendant was 18 years old when he committed the offenses that resulted in the imposition of a mandatory minimum 76-year aggregate sentence. *Id.* ¶ 1. Despite the defendant's failure to develop a factual and legal basis for such claim in the trial court (*id.* ¶ 35), on direct appeal the defendant claimed that his sentence was unconstitutional under article I, section 11, of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and under the eighth amendment to the United States Constitution (U.S. Const., amend. VIII). *Harris*, 2018 IL 121932, ¶ 17.

¶ 105    The appellate court rejected the defendant's facial eighth amendment attack on the constitutionality of his sentence but found such sentence to be contrary to the "rehabilitation clause" of article I, section 11: "[W]e believe that it shocks the moral sense of the community to send this young adult to prison for the remainder of his life, with no chance to rehabilitate himself into a useful member of society." *People v. Harris*, 2016 IL App (1st) 141744, ¶ 69.

¶ 106    The dissent, however, maintained that the defendant's as-applied challenge was improper where the defendant failed to either support his claim with any evidence or develop a record to enable the appellate court to review such claim, thereby violating the court's ruling in *People v. Thompson*, 2015 IL 118151, ¶¶ 37-39. The dissenting justice noted that she would have rejected the defendant's claim on the merits. *Harris*, 2016 IL App (1st) 141744, ¶¶ 80-87 (Mason, J., concurring in part and dissenting in part).

¶ 107    In reviewing the appellate court's decision, our supreme court began by noting the critical distinction between facial and as-applied constitutional challenges. *Harris*, 2018 IL 121932, ¶ 38 (majority opinion). In order to prevail on a facial challenge, a party must show that the statute is unconstitutional under any possible set of facts, while an as-applied challenge requires that the party establish the existence of specific facts and circumstances that make the resulting sentence unconstitutional. *Id.* The latter cannot be accomplished in the absence of an

evidentiary hearing and specific findings of fact. *Id.* ¶¶ 39-40. "[A] reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Id.* ¶ 41 (quoting *People v. Minnis*, 2016 IL 119563, ¶ 19).

¶ 108     Furthermore, the court held that the "very narrow exception" to this general rule articulated in *People v. Holman*, 2017 IL 120655, ¶ 32, did not apply to the defendant where *Holman* involved a defendant who was a juvenile when the crime was committed and where all the facts and circumstances necessary to consider the defendant's *Miller* claim were contained in the record. *Harris*, 2018 IL 121932, ¶ 43. Unlike *Holman*, the *Miller* factors did not apply to the defendant, who was 18 years old at the time of the offense. *Id.* ¶ 45. Nor did the defendant's PSI contain sufficient information to consider the merits of his claim in the absence of an evidentiary hearing. *Id.* ¶ 46.

¶ 109     The *Harris* court denied the defendant's request that the case be remanded for an evidentiary hearing. *Id.* ¶¶ 47-48. Based on its previous ruling in *Thompson*, 2015 IL 118151, ¶ 44, the court determined that an evidentiary hearing would be premature in the absence of any evidence supporting the application of *Miller* to the defendant's particular circumstances. *Harris*, 2018 IL 121932, ¶¶ 46, 48.

¶ 110     Additionally, the court considered the defendant's renewed facial eighth amendment challenge to the constitutionality of his sentence based on emerging science, which the defendant maintained justified expanding the *Miller* protections to young adults ages 18 to 21. *Id.* ¶ 50. In rejecting the defendant's facial challenge, the court held:

> "We agree with those decisions and our appellate court that, for sentencing purposes, the age of 18 marks the present line between juveniles and adults. As an 18-year-old, defendant falls on the adult side of that line. Accordingly, defendant's facial challenge to his aggregate sentence under the eighth amendment necessarily fails." *Id.* ¶ 61.

¶ 111     We must follow the precedent of our supreme court. See *People v. Artis*, 232 Ill. 2d 156, 164 (2009). The court's decision in *Harris* disallows us from granting defendant the relief that he seeks where defendant only raised a facial eighth amendment challenge to the constitutionality of his mandatory natural life sentence:

> "DEFENSE COUNSEL: Just that we object to the natural life sentence would be a violation of the 8th Amendment, prohibition against cruel and unusual punishment.
>
> Your Honor is pointing out, my client was very young, 18 and 19 at the—at the time of these incidents; and based on that, Judge, we object to a natural life sentence being imposed; and we have nothing to argue beyond what is indicated in the Presentence Investigation, Judge."

¶ 112     Defendant has now abandoned his facial challenge to section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILS 5/5-8-1(a)(1)(c)(ii) (West 2012)) and supplanted it with what appears to be both an as-applied challenge under the eighth amendment (U.S. Const., amend. VIII) and an as-applied challenge under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Under the express terms of *Harris*, we may not remand this case for an evidentiary hearing where this claim was wholly undeveloped in the trial court. We reject defendant's reliance on the fact that the State has made a similar request of our supreme court in their petition for leave to appeal the court's decision in *People*

*v. House*, 2019 IL App (1st) 110580-B, *appeal allowed*, No. 125124 (Jan. 29, 2020). The Illinois Supreme Court possesses authority to order such a hearing. We do not.

¶ 113   Furthermore, as in *Harris*, defendant does not fall within the narrow exception discussed in *Holman*, where the defendant was 19 years of age when he committed this offense and 18 years of age when he committed the previous murder in case No. 14 CR 2643. As in *Harris*, the record in this matter does not support application of *Miller* to this case.

¶ 114   We also decline defendant's invitation to bypass the clear mandate of *Harris* by considering his claim under the umbrella of ineffective assistance of counsel. As the State correctly notes, defendant provides no authority for us to do so, and we will not do indirectly what we cannot do directly. As an aside, we note that contents of defendant's PSI, as previously recounted, make this case a particularly poor vehicle for contemplating such a deviation from the rule of law.

¶ 115   Finally, to the extent that defendant criticizes the trial court for not conducting a proper as-applied hearing that was never requested in the first place, we feel compelled to note that the trial court exercised an abundance of caution in addressing the claim that defendant did interpose: his eighth amendment facial challenge to his natural life sentence. In doing so, the court acknowledged what was then current binding case law, the First District Appellate Court's decisions in both *Harris*, 2016 IL App (1st) 141744, and *People v. House*, 2015 IL App (1st) 110580, and correctly noted that no Illinois case held that a natural life sentence for an individual over 18 years of age violated the eighth amendment.

¶ 116   The trial court even went further and recognized that both *House* and *Harris* found constitutional infirmities under the proportionate penalties clause of article I, section 11, of the Illinois Constitution, as opposed to under the eighth amendment. Furthermore, the court acknowledged that under *Holman*, 2017 IL 120655, a juvenile could receive a natural life sentence, but only where the trial court determined that the minor's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. That the court, anticipating the possibility that the law might develop to permit application of the *Holman* analysis for adult sentences of natural life imprisonment, made explicit findings of fact supporting the sentence imposed, appears to us to be a judicious use of caution on the part of the trial judge.

¶ 117   Finally, defendant's characterization of the court's factual findings are not well-taken. The videotape and Dr. Cina's stipulated testimony support the conclusion that Mr. Sandoval was shot from behind. The victim impact statement provided a compelling portrait of the impact left in Mr. Sandoval's wake as a result of this senseless murder. Finally, defendant provides no authority that would disallow a trial court from considering evidence adduced at a trial over which the same trial judge presided in fashioning an appropriate sentence.

¶ 118   In conclusion, we deny defendant's request that we remand this case for an evidentiary hearing to determine whether defendant's natural life sentence is unconstitutional as applied.

¶ 119                               III. CONCLUSION

¶ 120   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 121   Affirmed.

¶ 122    PRESIDING JUSTICE GORDON, concurring in part and dissenting in part.

¶ 123    In the case at bar, the 19-year-old defendant was convicted of first degree murder after a bench trial and sentenced to natural life in prison without the possibility of parole.

¶ 124    I concur with the majority that we must affirm defendant's conviction. However, I must write separately because I dissent from the majority's finding to affirm the 19-year-old's sentence of life in prison and denies him a new sentencing hearing and I also dissent from the majority's finding that the evidence in this case was closely balanced.

¶ 125    Earlier this year, I dissented from a Rule 23 order affirming defendant's conviction in a prior, unrelated case. *People v. Ortega*, 2021 IL App (1st) 172007-U. In that prior case, I found, first, that the trial judge had abused his discretion by denying defendant's request for discovery regarding the State's expert in historical cell site analysis. *Ortega*, 2021 IL App (1st) 172007-U, ¶ 80. In addition, the prosecutor in closing statements repeatedly asserted that defendant said he was going to "kill" the victim, when defendant was actually reported as saying he was going to "call" the victim. *Ortega*, 2021 IL App (1st) 172007-U, ¶ 103. There is a big difference between "kill" and "call." Based on the cumulative errors in the prior case, I found:

"In light of the cumulative error regarding both the expert and the State's outlandishly false—and repeated—'kill' statements in closing argument, and in light of the fact that the State's case consisted of very weak, circumstantial evidence, I find that a reversal and a remand is required here. The evidence in this case was closely balanced, and there was a reasonable probability that without those errors the jury may have acquitted defendant. I am not confident that defendant received a fair trial. For these reasons, I must respectfully dissent from the majority's order." *Ortega*, 2021 IL App (1st) 172007-U, ¶ 107.

¶ 126    In the case currently before us, the trial judge was the same trial judge who presided over the prior case, and he relied heavily on that prior case in fashioning the sentence in the case at bar. In sentencing defendant in this case to life in prison, the trial judge stated that he had "an independent recollection" of the prior case and recited the facts from that case as he remembered them. Obviously, the judge did not find, as I did, that he had abused his discretion in the prior case or that the jury trial he had presided over was fundamentally unfair. To the contrary, in recounting the facts of the prior case, the trial judge gave great weight to the prior finding of guilt and found that the motive for the prior murder was "inexplicable" and "[t]hat's similarly the case here." Based in part on that prior case, the trial judge proceeded to find defendant permanently incorrigible and, therefore, sentenced him to life in the case at bar. For all the reasons that I dissented from the prior case, I must similarly dissent here from affirming a life sentence based, in part, on that prior case.

¶ 127    However, my dissent does not end there. The majority finds that we, as an appellate court, lack the authority to remand at this juncture for a new sentencing hearing. *Supra* ¶ 112. Not only do we have the authority but we have done so in prior cases, including cases that the authoring justice has concurred with. *E.g.*, *People v. Jones*, 2021 IL App (1st) 180996, ¶ 33 (this court remanded for resentencing in the case of a 19-year-old defendant who was convicted of first degree murder and sentenced to a total of 50 years). As we explained in *Jones*,

"[w]e find that it makes no sense to deny defendant's claim now, only to see the same claim back again in a postconviction petition. [Citation.] In the interests of judicial economy, and given the unique facts of this case, and in light of all the relevant cases

decided since defendant's sentencing such as *Buffer* and *House*, we remand for resentencing now." *Jones*, 2021 IL App (1st) 180996, ¶ 33.

Similarly, in the case at bar, given the unique facts of this sentencing where the trial judge relied heavily on a prior case that involved prosecutorial misconduct, I would remand for resentencing now. In the prior case, although the majority affirmed, the majority still acknowledged the State's repeated improprieties and misstatements of fact in its closing argument. *Ortega*, 2021 IL App (1st) 172007-U, ¶¶ 66-68.

¶ 128 In numerous cases, this court has found that Illinois law—both our statutory law and our case law—treats youths under the age of 21 differently from adults who are 21 years and older. See *People v. Glinsey*, 2021 IL App (1st) 191145, ¶¶ 46-48; *People v. Franklin*, 2020 IL App (1st) 171628, ¶¶ 61-63; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 39-42; *People v. Savage*, 2020 IL App (1st) 173135, ¶¶ 67-69.

¶ 129 As defendant observes, the trial court found that this 19-year-old defendant was permanently incorrigible and gave him the harshest penalty permitted under our law, without considering a single factor related to youth and its attributes. The trial court noted defendant's age at the time of this offense and the prior offense and observed merely: "I can appreciate that those things happen sometime with the whip saw of adrenaline, and machismo that sometimes seems to accompany people who are motivated by gang royalties and gang membership."

¶ 130 As this court has observed before, "[l]ife without parole is the most severe penalty now permitted by Illinois law, and it shares 'characteristics with death sentences that are shared by no other sentences.' " *Franklin*, 2020 IL App (1st) 171628, ¶ 58 (quoting *Graham v. Florida*, 560 U.S. 48, 69 (2010)); see also *People v. Patterson*, 2014 IL 115102, ¶ 108 (the death penalty is unique and shares characteristics with no other sentence "besides life without parole"). Life without parole is similar to a death sentence in that it "alters the offender's life by a forfeiture that is irrevocable." *Graham*, 560 U.S. at 69. A life sentence is "far more severe" when it denies the possibility of parole. *Solem v. Helm*, 463 U.S. 277, 297 (1983); see also *Graham*, 560 U.S. at 70. Such a sentence " 'means that good behavior and character improvement are immaterial; it means *** he will remain in prison for the rest of his days.' " *Graham*, 560 U.S. at 70 (quoting *Naovarath v. State*, 779 P.2d 944, 944 (Nev. 1989)). "It deprives the convict of the most basic liberties" without giving any "hope of restoration." *Graham*, 560 U.S. at 69-70.

¶ 131 Thus, life without the possibility of parole should be reserved for those rare offenders who are beyond any hope of redemption. *Franklin*, 2020 IL App (1st) 171628, ¶ 59.

¶ 132 In the case at bar, the murder occurred—by all accounts—after the teenage defendant had been drinking hard liquor and smoking marijuana, starting in the afternoon, through the night, and until early the next morning. State's witness Joshua Johnson testified that defendant was " 'tweeking,' " meaning " 'being stupid, acting crazy.' " *Supra* ¶ 25. Johnson testified that, at some point during the evening, defendant began talking about his father passing away in a drunk driving accident and that defendant was becoming "emotional" and "angry."

¶ 133 In sum, I would reverse and remand for a new sentencing hearing before a different judge, where the teenage defendant was thoroughly drunk and stoned when the offense was committed; where he received the harshest possible punishment available in our state; where this punishment of life without the possibility of parole is even more harsh for such a young defendant because he will have more decades to remain behind bars; where this punishment was based, in part, on a prior conviction that I would reverse which involved repeated false statements by the prosecutor; and where defendant's life-without-parole sentence here was

- 24 -

determined by the same trial judge who made cumulative error in the prior case. For these reasons, I must respectfully dissent from the majority's finding to affirm defendant's sentence.

¶ 134     Although I agree that we must affirm defendant's conviction, I disagree with the majority's finding that the evidence in this case was not closely balanced. There was no confession by defendant, no physical evidence linking defendant to the offense, and no arrest at the scene of the crime. The videotape of the offense is not clear enough to discern the identity of the offenders. The State's evidence consisted of the testimony of gang members and a gang member's wife who were all impeached to different degrees. The trial judge specifically found: " 'they are impeached.' " *Supra* ¶ 40. While I do not concur with the majority's finding that this case was not closely balanced, this finding was merely an additional reason provided by the majority for affirming and not central to its opinion. *Supra* ¶ 79. Thus, I concur with the majority's finding to affirm.

¶ 135     For all the foregoing reasons, I respectfully concur in part and dissent in part.