2021 IL App (1st) 181858-U

FOURTH DIVISION
December 23, 2021

No. 1-18-1858

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the<br>) Circuit Court of<br>) Cook County |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) No. 14 CR 11753 (03) |
| WILLIAM GILLYARD, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) Honorable<br>) Allen F. Murphy,<br>) Judge Presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Affirming defendant's conviction and sentence for first-degree murder and attempted first-degree murder where (1) the evidence was sufficient to find him guilty beyond a reasonable doubt that he personally discharged the firearm involved in the offenses and (2) his sentence did not violate the proportionate penalties clause of the Illinois Constitution and was not otherwise excessive.

¶ 2   Following a jury trial, defendant William Gillyard was found guilty of the first-degree murder of John McIntyre and attempted first-degree murder of Najee Kellum.  The jury also

specially found that defendant personally discharged a firearm during the commission of these offenses. Defendant, who was 19 years old at the time of the offense, was sentenced to a total of 110-years plus natural life in the Illinois Department of Corrections. On appeal, defendant challenges the sufficiency of the evidence and maintains his sentence was unconstitutional under the proportionate penalties clause of the Illinois Constitution as applied to him or was otherwise excessive. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4      Defendant, along with codefendants Kendall Roberson and Essie Nooner, was charged with numerous counts of first-degree murder for the death of McIntyre as well as numerous counts of attempted first-degree murder for the shooting of Kellum in Sauk Village, Illinois after midnight on June 7, 2014. Prior to trial, the court granted defendant's motion to sever his trial from that of his codefendants. Roberson and Nooner were tried in February 2018 prior to defendant.

¶ 5      Defendant's trial commenced in June 2018 with the State presenting evidence from multiple witnesses that defendant, Roberson, and Nooner planned to rob McIntyre of his money and drugs by luring him to Roberson's house under the premise that they would sell McIntyre televisions. When McIntyre arrived at Roberson's house with his girlfriend, Najee Kellum, who was riding in the front passenger seat, defendant, Roberson, and Nooner entered McIntyre's vehicle and directed McIntyre to an abandoned building where the televisions were being stored. As McIntyre was parking the vehicle at the abandoned building, he was shot in the back of the head and Kellum was shot in the face and wrist. Defendant, Roberson, and Nooner fled the scene.

¶ 6      The State presented the testimony of individuals who knew defendant or the

codefendants.  Each of these individuals testified that they could not recall the events of June 6-7, 2014, or their testimony before the grand jury.  Accordingly, the State impeached each of them with their grand jury testimony and further admitted into evidence videotaped statements they had provided to the detectives.[1]

¶ 7    Marcus Stokes testified that on the morning of June 6, 2014, he was on Roberson's porch with defendant, Roberson, and Nooner smoking marijuana.  Stokes could not recall their conversation; however, in his videotaped statement to detectives he informed them that Nooner was saying how they were going to rob McIntyre of his money and drugs.  Nooner was also saying how he was going to call McIntyre over and if McIntyre was alone they were just going to rob him and if he had a witness with him they were just going to kill the witness.  Stokes also told the detectives that defendant stated he was going to shoot McIntyre in the head.  After he finished smoking, Stokes left and did not return to Roberson's residence.  Stokes testified similarly before the grand jury.  Clips from Stokes' videotaped interview and his grand jury testimony were admitted into evidence and published to the jury.

¶ 8    On cross-examination, Stokes testified that he could not remember anything that was said while he was on the porch with defendant, Roberson, and Nooner.  He also did not notice defendant with a firearm.  Stokes further testified that he did not tell the truth to the detectives or to the grand jury.

¶ 9    Durrell Roberson, codefendant Kendall Roberson's brother, testified that on June 8, 2014, he met with assistant State's attorney Kathryn Morrissey and provided a written statement which she typed.  He further testified that he did not remember what the statement said nor what

_____

[1] The State presented as witnesses various assistant State's attorneys who testified they were present for the grand jury testimony of the witnesses and that the questions and answers reflected in the transcripts of the proceedings were accurate.

he said in his grand jury testimony. Before the grand jury, Durrell testified that on the afternoon of June 6, 2014, he was standing outside of his residence with defendant, Roberson, Nooner, Iesha Stewart, and Tamara Ivy talking about the merchandise Roberson and Nooner were going to try to sell to McIntyre. According to Durrell, Roberson and Nooner had sold merchandise to McIntyre previously. Then, during that conversation, defendant said that he was going "to take [McIntyre] down" meaning that he was going to take all of McIntyre's money and drugs. Defendant did not say he was going to shoot McIntyre. Durrell, however, testified that during the conversation defendant showed him the brown handle of a .38 caliber pistol. Durrell further testified that later on June 6, 2014, he was present when Roberson called McIntyre to see if he was still coming to buy the merchandise. Before McIntyre arrived, Durrell left and came back to Roberson's house about 20 or 30 minutes later. No one was present so he waited outside the residence. Roberson then came up to the house looking "traumatized."

¶ 10    On cross-examination, Durrell testified that he had been smoking marijuana on June 6, 2014, and taking Xanax, which he had been prescribed due to an automobile accident. Durrell further testified that he was addicted to Xanax on that date and is still addicted to the drug. On recross examination, Durrell testified that the automobile accident occurred on June 8, 2014, after the shooting had occurred.

¶ 11    Tamara Ivy testified that on June 6, 2014, she was 18 or 19 years old and had been dating Nooner for a couple of weeks. Her cousin, Iesha Stewart, was dating Roberson. On June 6, 2014, at 3 p.m. she was at Roberson's house with Roberson, Nooner, and Stewart. At some point she left to drop a friend off, taking Stewart with her. She returned to Roberson's house at 11 p.m. with Stewart and they were outside with Roberson, Nooner, and defendant. Ivy identified defendant in court as the individual who was at Roberson's house on June 6, 2014, at

11 p.m. When asked if she heard any conversations that evening, Ivy responded that she did not remember. Ivy was then asked if she recalled providing answers to certain questions asked by detectives; she replied she did not remember.

¶ 12    The State then admitted into evidence and published to the jury Ivy's videotaped interview with detectives, which was taken on June 8, 2014. In the videotape, Ivy told detectives that at around 11 p.m. on June 6, 2014, defendant asked Nooner and Roberson if they were ready and then said "I'm going to shoot him in the back of his head and rob him of his drugs and money." Ivy understood that defendant was going to shoot "the man that was coming to get him" in the head. Ivy also told detectives she observed a handgun in defendant's left hoodie pocket. Ivy described the handgun as looking like "a gun off a cowboy show, silver and brown" and that the handle was brown and the "gun part" was silver. She was present when an SUV picked up defendant, Roberson, and Nooner at Roberson's house. A woman was in the passenger seat of the vehicle. Defendant, Roberson, and Nooner entered the vehicle and she went to a McDonald's restaurant with Stewart because she was scared. The two sat in the parking lot and then heard gunshots and observed police vehicles.

¶ 13    After viewing the videotape in court, Ivy continued to testify that she could not recall making those statements. She also testified that she could not recall her testimony before the grand jury. The State admitted into evidence and published to the jury Ivy's grand jury testimony. Ivy's grand jury testimony was substantially similar to her videotaped statements. Ivy included in her grand jury testimony that defendant said "somebody is going to die today" while standing outside of Roberson's house. She further testified that defendant entered the SUV through the passenger side first, followed by Nooner and Roberson. After hearing gunshots, she went back to Roberson's house and observed Roberson running toward his house.

¶ 14    On cross-examination, Ivy testified that June 6, 2014, was the first time she met defendant. Ivy further testified, consistent with her testimony before the trial court in February 2018, that she was inside her vehicle in Roberson's driveway the evening of June 6, 2014, and did not hear any conversations taking place between defendant, Nooner, and Roberson.

¶ 15    Iesha Stewart[2] testified she could not recall what occurred on June 6-7, 2014. Accordingly, the State presented evidence of her videotaped interview with the detectives and grand jury testimony, which established the following. Stewart was 16 years old on June 6, 2014. At 3 p.m. that day, she was at Roberson's house with defendant, Roberson, Nooner, Ivy, Stokes, Durrell, and two other friends of Roberson's. She and Ivy left, but returned at 10 p.m. That evening, she stood in Roberson's driveway with defendant, Roberson, Nooner, and Ivy while defendant, Roberson, and Nooner discussed selling televisions to McIntyre and wanting to rob him of drugs and money. Stewart testified to the grand jury that defendant "was saying how he shoot people [*sic*] and stuff, and he was saying how they should not just rob [McIntyre], but they should kill him." When asked how defendant was going to shoot McIntyre, Stewart testified "shoot him in the back of the head, so he [defendant] don't see his face." According to Stewart, defendant also informed the group that he was in possession of a handgun; however, Stewart did not view the weapon at that time.

¶ 16    Stewart further testified before the grand jury that shortly thereafter, she observed an SUV pull up to Roberson's house. Two people were inside the vehicle, with one driving and another in the passenger seat, but she could not see their faces. She observed defendant, Roberson, and Nooner get into the back of the SUV. She then drove with Ivy a couple of blocks down the road to McDonald's where they remained in the parking lot. While in the parking lot

_____

[2] The record reflects that on June 6, 2014, Stewart went by the name "Alexis."

she observed a police vehicle with its siren on. After five minutes, they went back to Roberson's residence where Stewart observed Roberson "sprinting" back into his house.

¶ 17    During her grand jury testimony, Stewart was presented with a photograph of defendant taken upon his arrest. When asked by the prosecutor if there were any differences in the photograph of defendant from when Stewart last saw him on June 6, 2014, Stewart testified that defendant had cut his hair.

¶ 18    On cross-examination, Stewart testified that while at the police station the detectives threatened to arrest her for McIntyre's death. She further testified that on June 6, 2014, she had been dating Roberson for two weeks and had been over to his residence only on three occasions. Stewart also denied being part of the discussion in Roberson's driveway and testified she did not have a discussion with defendant. She denied being present at Roberson's house at 10 p.m. on June 6, 2014. Stewart acknowledged that it was her image on the videotape, but stated it was not her voice. She denied signing any photographs identifying individuals in this case.

¶ 19    Najee Kellum, also known as Miracle, testified that in June 2014 McIntyre was her boyfriend and she owned a Ford Explorer with a broken rear driver's side passenger door. Around 11 p.m. on June 6, 2014, she and McIntyre were at a Steak 'n Shake restaurant when McIntyre received a call on his cell phone. Kellum was able to hear the phone conversation between McIntyre and the other individual. The man asked if McIntyre wanted to purchase some televisions for $300. After which they left the restaurant with McIntyre driving Kellum's SUV and Kellum seated in the front passenger seat. McIntyre drove them to a location on the Sauk Trail between Merrill and Jeffery Streets, which she knew to be Roberson's house as she had been there on three or four prior occasions with McIntyre. When they arrived, three men and two women were standing outside. The three men who were standing outside entered the

SUV and seated themselves in the back of the vehicle. Kellum did not pay attention to who was entering the vehicle. McIntyre drove three or four blocks away to an abandoned house. McIntyre pulled into the driveway and then "they" told him to pull out and back in, but before McIntyre could even put the vehicle in gear, Kellum heard a gunshot and saw a spark. She looked at McIntyre and noticed he had been shot in the head. She could smell gunpowder and something burning. She looked behind her to see what was going on and heard another gunshot and realized she had been shot. Then she heard another gunshot, which struck her in the wrist. She later learned that the first gunshot had struck her in the face. Kellum exited the vehicle and began running to find help. She was taken to St. James Hospital and then transferred to Christ Hospital where surgery was performed on her face and wrist.

¶ 20    Kellum further testified that the shooting happened quickly and that, at the time, she was unsure of whether the gunshots came from inside or outside of the vehicle. In addition, there was some marijuana in the front cupholder at the time the shooting occurred, but photographs of the vehicle after the shooting do not depict the marijuana.

¶ 21    Regarding the identities of the three men they picked up outside of Roberson's house, Kellum testified that on June 6-7, 2014, she recognized one individual, Nooner, whom she had gone to high school with. She further testified that when the three men exited the SUV, defendant's "hoodie had flew off, so I seen't [sic] him, I seen his face." However, when shown a photograph of defendant by detectives during the investigation, she identified defendant only as a person she had attended high school with and not as someone who was at the scene of the shooting. Kellum explained that she did not identify defendant at the time as she had been recovering from surgery and was on medication. Kellum clarified that it was now her testimony that she observed defendant at the scene.

¶ 22    On cross-examination, Kellum testified that she always had identified Nooner as one of the three men who entered the back seat of the SUV.  She further testified that she knew Roberson's face, but did not recall his name at the time she was questioned by detectives.  She admitted she did not identify defendant when she was questioned by detectives immediately after the shooting.  During her second interview with detectives, which occurred at 3 p.m. on June 7, 2014, she identified photographs of Nooner and Roberson as the individuals who were in the backseat of the SUV.  Kellum admitted that she said she was 50 percent sure it was Roberson when she was questioned by the detectives and explained, "I said that, yeah, he was in the back seat.  I just ain't know his name.  I ain't remember his name at the time."  She also testified that all three men were wearing hoods over their heads when they entered the SUV.

¶ 23    Kellum further testified that Nooner was seated behind her, with Roberson in the middle.  She described the man seated behind McIntyre as an African-American male with a dark complexion and short braids or twists showing from underneath his hood.  She informed the detectives that this individual looked like defendant and "I know it was him because all three of them be together all the time."  In her written statement, Kellum indicated that she did not see the face of the person who was sitting behind McIntyre but "[h]is build and hairstyle reminded me of a person I've known since high school called Big Will [(defendant's nickname)]."

¶ 24    Kellum testified that while she did not initially know where the shots were coming from, when she was shot in the wrist she knew that the shots were coming from behind her.  Kellum also testified she had always "been certain" that defendant was in the SUV and she informed detectives "that all three of them always together, and he told me – [McIntyre] told me earlier that day that he was going to be buying TV's and he named all three of them."

¶ 25    Tracy Bankhead, Jr. testified that he has been defendant's friend for 10 years and knew

both McIntyre and Kellum from the neighborhood. He also knew codefendants Roberson and Nooner. Bankhead testified that in June 2014, he resided on the 2000 block of 217th Place in Sauk Village, Illinois.

¶ 26 When asked various questions regarding what occurred in the early morning hours of June 7, 2014, Bankhead testified that he could not recall. He also could not recall any statements he made to detectives in his videotaped interview or those statements he made during his grand jury testimony. Accordingly, the State admitted into evidence and published to the jury portions of Bankhead's videotaped interview and his grand jury testimony. This evidence established that in the early morning hours of June 7, 2014, defendant came to Bankhead's residence in Sauk Village and appeared nervous and scared. Defendant told him that "the robbery went wrong and [he] had shot [McIntyre]." Defendant explained that he had shot McIntyre "in the back of the head." Defendant also admitted to him that he had shot Kellum "a couple of times too." Defendant told Bankhead that he had placed the shells from the firearm in the sewer. While Bankhead drove with defendant to Bankhead's sister's house, defendant again repeated to him what had happened during the shooting. The following day, they returned to Sauk Village and defendant asked Bankhead to look after his mother and sister as he was leaving town.

¶ 27 On cross-examination, Bankhead testified that he did not have personal knowledge of what happened to McIntyre and Kellum. Bankhead further testified that the assistant State's attorney who participated in his videotaped interview provided him with the facts of the case at the time of the interview.

¶ 28 Officer Seth Brown of the Sauk Village Police Department testified that after midnight on June 7, 2014, he was on patrol and received a dispatch to go to the 2100 block of 217th Street. Upon arrival, he observed Kellum with a gunshot wound to her wrist. After speaking with

Kellum, he went to another location on the 2100 block of 217th Street and found an SUV backed into the driveway with a man seated in the driver's seat with the driver's side door open. The front and side passenger doors were open as well, but the rear passenger door behind the driver's seat was closed. McIntyre was bleeding profusely from the mouth, but was still alive. Officer Brown observed a gunshot wound to the back of McIntyre's head and called the paramedics. Officer Brown also testified to a series of photographs of the scene which were admitted into evidence and published to the jury.

¶ 29    Officer Jon Foster, a crime scene investigator with the Illinois State Police, testified that he was called to the scene at 1:50 a.m. on June 7, 2014. He observed a vehicle parked partially on the grass and partially on a driveway. All but the rear driver's side passenger door were open and there was red blood-like stains all over the front cabin of the vehicle. His photographs of the scene were admitted into evidence and published to the jury. Officer Foster further testified that a blue baseball cap was discovered in the backseat behind the driver's seat. The baseball cap did not have any apparent defects, but the bill and insides of the baseball cap had red blood-like stains. Officer Foster further testified that no shell casings were discovered in the vehicle. When asked by the prosecutor whether a revolver would leave shell casings, Officer Foster responded that a revolver does not eject shell casings.

¶ 30    On cross-examination, Officer Foster testified that no gunshot residue testing or DNA testing was performed on the baseball cap. He also swabbed the backseat of the vehicle for DNA and discovered a partial, latent fingerprint on the exterior of the driver's side passenger door. No DNA, fingerprint, or toolmark evidence was admitted into evidence.[3]

---

[3] The parties stipulated that a deformed bullet was removed from Kellum's left cheek and that it was placed in an evidence bag and a proper chain of custody was maintained over it. The bullet, however, was not admitted into evidence.

¶ 31    Dr. Kristin Escobar-Alvarenga, assistant medical examiner for the Cook County Medical Examiner's Office, testified as an expert in the field of forensic pathology. Dr. Escobar-Alvarenga testified that she performed the autopsy of McIntyre and concluded that he died from a gunshot wound to the head and that the manner of death was homicide. Specifically, McIntyre suffered a "perforating gunshot wound to the head" meaning the bullet entered the back of his head and exited the front of his face just below his right eye. Dr. Escobar-Alvarenga further testified that she observed no evidence of stippling. According to Dr. Escobar-Alvarenga, stippling occurs when gunshot residue is deposited on the victim when a shot is fired in close-range of less than two feet. The gunshot residue, however, can be filtered out if the victim was wearing a hat or by the victim's hair or blood. Dr. Escobar-Alvarenga testified that the range of firing in this case was "indeterminate."

¶ 32    On cross-examination, Dr. Escobar-Alvarenga testified that the gunshot could have been fired more than two feet or more than 10 feet. On recross, however, Dr. Escobar-Alvarenga testified that it was possible that the gunshot wound in this case could have been inflicted from a range of closer than two feet.

¶ 33    Detective Kyle Wilbanks of the Glenwood Police Department testified that in June 2014 he was part of the South Suburban Major Crimes Task Force and was assigned to investigate the June 7, 2014, shooting. On June 9, 2014, at 6:25 p.m. he attempted to locate defendant at an apartment building. When he knocked on the door, Lawrence Wilson (defendant's uncle) answered and stated that defendant was not present inside the residence. Wilson then signed a consent to search form and Detective Wilbanks searched the apartment. He discovered defendant in a bedroom closet, crouching down on the floor. Defendant was placed into custody and brought to the Sauk Village Police Department.

¶ 34    Detective Wilbanks further testified that defendant waived his *Miranda* rights and agreed to speak to him.  In his videotaped interview defendant explained that earlier in the day on June 6, 2014, he was "chilling" with some women.  He further stated that "they" were going to sell flat screen televisions, but did not state who "they" were.  Later that evening he entered a vehicle with an individual he knew to be a drug dealer and sat behind the driver.  They drove to the vacant building and parked.  Defendant asked to get out of the vehicle.  Roberson and Nooner exited out the right rear passenger door so defendant could exit as the door closest to defendant was not working.  As defendant was walking away, he heard gunshots.  Defendant noticed Kenneth Deer on the street and asked Deer to drive him to Steger, Illinois.  According to defendant, he was going to turn himself in, but was scared for his safety.  Defendant denied pulling the trigger of the weapon that killed McIntyre and injured Kellum and maintained his innocence.

¶ 35    The State rested and defendant moved for a directed verdict, which was denied. Defendant then presented the following evidence.  Detective Lawrence Weinbrecht of the Lynwood Police Department, testified that on June 7, 2014, he was assigned to the South Suburban Major Crimes Task Force.  He investigated McIntyre's death and the shooting of Kellum.  On June 7, 2014, at 2 a.m. he went to St. James Hospital to speak with Kellum.  At that time, Kellum did not inform him that she observed the face of the third person who had been in the vehicle when his hood flew off.  In fact, she did not inform him that she recognized any of the three individuals at that time.  Detective Weinbrecht also interviewed Kellum at Christ Hospital on June 7, 2014, at 3 p.m.  Kellum did not inform him she viewed the third individual's face.  She also did not inform Detective Weinbrecht that she recognized Nooner.  Detective Weinbrecht again interviewed Kellum at Christ Hospital on June 8, 2014, and she did not

indicate she recognized the third subject to be defendant. In her fourth interview on June 9, 2014, Kellum again did not identify the third suspect nor did she state that this individual's hood flew off and she observed his face.

¶ 36    The parties then entered a stipulation that, if called to testify, Detective Villetto[4] would state that when he assisted Kellum in preparing her written statement on June 9, 2014, at Christ Hospital, she never indicated to him that someone's hood flew off or that she observed the person's face, and that she did not indicate that she recognized or knew who the third person in the vehicle was.

¶ 37    Defendant testified that on June 6, 2014, he was 19 years old and attending community college. In the early afternoon on that day, he was outside of Roberson's house with Roberson, Nooner, and Durrell. A couple of women from the neighborhood were also there. He then left Roberson's house and went back to his home. That evening, when it was dark outside, he came back to Roberson's house. Roberson and Nooner were standing outside. A couple of women were inside a vehicle nearby. As he walked up to greet Roberson and Nooner, he observed a dark-colored truck park near the end of the driveway on the main street. They told defendant that they were going to sell some televisions. Roberson and Nooner asked defendant to help carry the televisions. Defendant agreed and they walked toward the truck. Defendant observed a man in the driver's seat and a woman in the front passenger seat. Defendant entered the vehicle through the rear driver's side passenger door and sat behind the driver. Roberson and Nooner used the rear passenger side door. When defendant was seated in the vehicle he recognized the driver as a drug dealer he had purchased marijuana from previously. They drove five blocks, and during the drive defendant purchased marijuana from the driver. The driver backed into the

---

[4] Detective Villetto's first name is not included in the record.

driveway of an abandoned house. Defendant then asked Roberson and Nooner to let him out of the vehicle because he could not open his door. They let defendant out and he went to go get the televisions, which he was told were located behind the house. This was not unusual to defendant as he had been to the abandoned house before to help move televisions. As he was walking toward the back of the house he heard gunshots and he ran home. He could not recall how many gunshots he heard, but they sounded close.

¶ 38    When he arrived home he called Roberson and Nooner to see if they knew what happened and to ask if they were okay, but there was no answer. Defendant went outside and observed Deer parked in a vehicle on the street. He got into Deer's vehicle and they drove to Steger, Illinois. He spent the night in Steger and went back to his house the next day.

¶ 39    On June 7, 2014, defendant learned that McIntyre had been killed. He was being threatened so he went to his grandmother's house in West Chicago, Illinois. He then spoke with his mother on the telephone. She advised him to contact the police and get a lawyer. Before he could make it to the police department with a lawyer, the police came to his grandmother's house. When they knocked on the door, defendant hid in the closet because he was "scared of police brutality and at that time I didn't want to be arrested. I wanted to turn myself in willingly." He did not resist being arrested and cooperated with the police.

¶ 40    Defendant denied talking to Roberson and Nooner about killing or robbing the individual in the truck. He also did not hear Roberson and Nooner discussing robbing the person in the truck. Defendant testified he was unaware that Roberson and Nooner were setting the driver up. Defendant denied having anything to do with McIntyre's death and further denied ever possessing a firearm.

¶ 41    On cross-examination, defendant testified that after he exited the vehicle at the

abandoned house, Roberson and Nooner got back into the vehicle. Because he had walked away from the vehicle, he could not say whether the shots were fired from inside or outside the vehicle. When confronted with his videotaped interview with detectives, defendant admitted he did not initially tell the detectives that Nooner and Roberson reentered the vehicle after he exited. Defendant could not recall who he sat next to inside the SUV. Defendant denied having his hair styled in dreadlocks on June 6, 2014, but admitted he did, at one time, have his hair styled in such a manner. He further denied cutting his hair after the shooting.

¶ 42    The defense rested and, after hearing closing arguments, the jury deliberated and found defendant guilty on counts of first-degree murder of McIntyre while armed with a firearm, first-degree murder of McIntyre with the personal discharge of a firearm, first-degree attempted murder of Kellum while armed with a firearm, and first-degree attempted murder of Kellum with the personal discharge of a firearm.

¶ 43    Defendant filed a motion for a new trial, which was denied. The matter then proceeded to a sentencing hearing where the State presented the live testimony of McIntyre's parents. The defense presented no live mitigation evidence, but did admit into evidence defendant's presentence investigation report (PSI), which indicated he had no criminal history. Defense counsel then argued that defendant was 19 years old when he committed the offense, and was "a young kid with no criminal background." Defendant completed two years of high school and then earned his G.E.D. He worked two jobs prior to his arrest, one as a janitor at a fast food restaurant, and a part-time job as a factory worker. He used his earnings to support his family which included his mother and two younger sisters. Defendant's father was never present in his life. Defense counsel further argued that defendant had never been a member of a gang, nor had he been involved in any gang activity. Defendant also never abused alcohol or drugs. When

provided the opportunity to speak in allocution, defendant refused.

¶ 44    The trial court merged the first-degree murder counts together and the attempted murder counts together and sentenced defendant to 60 years in the Illinois Department of Corrections for the murder of McIntyre, plus a term of natural life for personally discharging the firearm that proximately caused McIntyre's death.  The trial court further sentenced defendant to 30 years' imprisonment plus a 20-year firearm enhancement for personally discharging a firearm for the attempted murder of Kellum.  In sentencing defendant, the trial court stressed the "brazenness and ferocity" of defendant's actions in the case and that the evidence "takes your breath away." The trial court further found that "the only conclusion you can come [to] from this evidence is that the Defendant's actions in this case w[ere] nothing short of a premeditated, deliberate intentional execution of [McIntyre] the silliest plot you can imagine."  The trial court observed that defendant openly bragged in front of the witnesses that he was going to shoot McIntyre in the back of the head and that anyone who was with McIntyre was going to be killed.  In the trial court's view, McIntyre "was nothing but a target.  A living, breathing, A.T.M. machine to the defendant."  The trial court found that defendant "was a man of his word, he said he would shoot McIntyre in the back of the head and he did" and that "[i]t was an act of total depravity."  The trial court further determined that the first-degree murder and attempted first-degree murder sentences would run consecutively for an aggregate sentence of 110 years plus a term of natural life.

¶ 45    Defendant made a motion to reconsider his sentence as excessive, which the trial court denied finding it was within its discretion to prescribe such a sentence.  This appeal followed.

¶ 46                                    ANALYSIS

¶ 47                              Sufficiency of the Evidence

¶ 48    Defendant maintains that the State failed to prove beyond a reasonable doubt that he personally discharged a firearm in the commission of the offense. Defendant asserts that he was convicted on weak circumstantial evidence from biased witnesses who had a vested interest in portraying him as the shooter. According to defendant, the lack of physical evidence demonstrates that he did not discharge a firearm. Based on the evidence presented, defendant argues that there is a substantial likelihood that one of his codefendants was actually responsible for the shooting. He requests this court vacate the natural life and 20-year sentence enhancements based on the jury's finding that he personally discharged a firearm and remand the matter for resentencing.

¶ 49    In response, the State asserts the evidence was sufficient given the testimony of Bankhead that defendant immediately confessed to the personal discharge of a firearm, as well as the consistency of the testimony between multiple witnesses that defendant was carrying a firearm at the time of the offense and boasted beforehand that he was going to shoot McIntyre in the back of the head.

¶ 50    The standard of review in challenging the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to the ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry the evidence or substitute its judgment for that of the jury on issues involving the weight of the evidence or credibility of witnesses. *Id.* A reviewing court will not reverse a criminal conviction unless the evidence is "unreasonable, improbable, or

so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). This standard of review applies regardless of whether the evidence is direct or circumstantial. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 51 In this instance, defendant does not challenge his underlying convictions of first-degree murder and attempted first-degree murder. Instead, he challenges the jury's special finding that he personally discharged a firearm. Such a sentence enhancement may be added to a sentence provided that it is pled and proved beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Our General Assembly has prescribed sentencing enhancements where a jury specially finds that a defendant personally discharged a firearm. When a defendant is found guilty of a first-degree murder in which he personally discharged a firearm during the commission of the offense that caused death to another person, the trial court "shall" enhance the defendant's sentence by 25 years up to a term of natural life. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014). If a defendant is found guilty of attempted first-degree murder where the person personally discharged a firearm, "20 years shall be added to the term of imprisonment." 720 ILCS 5/8-4(c)(1)(C) (West 2014).

¶ 52 We initially note that much of the testimony at the trial came in through the witnesses' prior grand jury testimony and interview statements. The introduction of this sworn grand jury testimony was properly admitted as substantive evidence pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2014)) as were the witnesses' impeaching interview statements. See *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 61 ("Section 115-10.1 seeks to advance the legislature's goal of 'prevent[ing] a "turncoat witness" from merely denying an earlier statement when that statement was made under circumstances indicating it was likely to be true.' " (quoting *People v. Thomas*, 354 Ill. App. 3d 868, 882

(2004))). As the grand jury testimony and impeaching interview statements were admitted as substantive evidence, we may consider them when determining the sufficiency of the evidence. See *People v. McNeal*, 298 Ill. App. 3d 379, 395 (1998).

¶ 53     After viewing the evidence in the light most favorable to the State, we find the record supports the jury's finding that defendant personally discharged a firearm in the commission of the offenses. Our supreme court has recognized that a criminal conviction may be based solely on circumstantial evidence. *Brown*, 2013 IL 114196, ¶ 49. While no witness testified either before the grand jury or at the trial that they observed defendant discharge the firearm, the circumstantial evidence presented adequately supports the jury's finding that defendant did so.

¶ 54     First, there was evidence that defendant was in possession of a firearm on June 6, 2014. Durrell and Ivy each testified before the grand jury that they observed defendant in possession of a handgun on June 6, 2014. Durrell testified before the grand jury that defendant showed him the brown handle of a .38 caliber pistol. In her grand jury testimony, Ivy testified she observed a handgun in defendant's left hoodie pocket. Stewart testified before the grand jury that while they were standing outside of Roberson's residence on the evening of June 6, 2014, defendant informed the group that he was in possession of a handgun although she did not view the weapon at that time. While defendant argues that Ivy and Stewart's testimonies should be discounted due to their relationships with the codefendants, such an argument is not supported by the record. Although Ivy and Stewart did testify that the codefendants were their respective boyfriends at the time, they also testified that their relationships were relatively new and during the trial no testimony was elicited that they were still dating the codefendants. In addition, there was no testimony elicited from either Ivy or Stewart regarding a motivation to implicate defendant. Indeed what is apparent in their testimonies is that, by failing to directly answer the State's

questions during the trial, Ivy and Stewart did not seek to implicate *anyone* in the shooting.

¶ 55    Second, multiple witnesses testified before the grand jury that defendant told them he intended to shoot McIntyre in the back of the head. Stokes testified that on the morning before the shooting occurred, he heard a conversation between Nooner and defendant in which defendant stated he was going to shoot McIntyre in the back of the head. Ivy and Stewart testified similarly—they both overheard defendant state he was planning on shooting McIntyre. Specifically, Ivy heard defendant state he was "going to shoot him in the back of his head and rob him of his money and drugs" and "somebody is going to die today." Stewart heard defendant say that "they should not just rob [McIntyre], but they should kill him" by "shoot[ing] him in the back of the head." Ultimately, McIntyre was shot in the back of the head and did die, just as defendant stated he would.

¶ 56    Third, and arguably most importantly, defendant admitted to his long-time friend, Bankhead, that he shot McIntyre and Kellum. Although Bankhead testified at defendant's trial that he learned of the shooting "on the street" and that he made statements to detectives and testified before the grand jury only after being threatened by the police, it was for the jury to decide what, if any, aspects of his testimony were credible. See *People v. Logan*, 352 Ill. App. 3d 73, 80 (2004) (appellate court could not substitute its judgment for that of the jury where it found the witness's pretrial statement and grand jury testimony more credible than her trial testimony). It is apparent by its verdict that the jury found Bankhead's grand jury testimony, and not his testimony before the trial court, to be credible. Bankhead testified before the grand jury that after the shooting occurred, defendant went to Bankhead's residence and informed Bankhead that the robbery went wrong and he shot McIntyre in the back of the head. Defendant also admitted to Bankhead that he had shot Kellum "a couple of times too."

¶ 57    Aside from Bankhead's credibility, his grand jury testimony corroborated many aspects of the witnesses' testimonies. Stokes, Durrell, Ivy, and Stewart testified before the grand jury that defendant planned to rob McIntyre of his money and drugs by luring him to Roberson's house under the premise that they would sell McIntyre televisions. Stokes, Ivy, and Stewart further testified that defendant intended on shooting McIntyre, with Ivy and Stewart stating that defendant claimed he would shoot the victim in the back of the head. The testimony of the medical examiner at trial established that McIntyre was shot in the back of the head. The testimonies of these witnesses thus serve to corroborate Bankhead's grand jury testimony that defendant informed him he shot McIntyre and Kellum.

¶ 58    In addition, defendant explained to Bankhead that he had disposed of the shell casings in the sewer. Officer Foster's testimony revealed that no shell casings were discovered in the SUV and that a revolver would not eject shell casings. Bankhead's testimony thus sheds light on why no shell casings were discovered in the SUV and is further corroborated by the witnesses' descriptions of the firearm defendant had in his possession on June 6, 2014. Accordingly, we find Bankhead's grand jury testimony firmly establishes that defendant exercised control and dominion over a firearm during and after the shooting.

¶ 59    We observe that the arguments set forth by defendant on appeal constitute a general attack on the credibility of the witnesses. It is the function of the jury as the trier of fact to assess the credibility of the witnesses and to resolve discrepancies and inconsistencies in the evidence. *People v. Jackson*, 2020 IL 124112, ¶ 66. The trier of fact may accept or reject all or part of a witness' testimony. *Logan*, 352 Ill. App. 3d at 81. The testimony of a single witness, if positive and credible, is sufficient to sustain a conviction although it is contradicted by the defendant. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In light of the fact that Kellum's

testimony failed to establish who discharged the firearm, it is reasonable for the jury to have accepted Bankhead's grand jury testimony as credible—along with the grand jury testimonies of Stokes, Durrell, Ivy, and Stewart—and find beyond a reasonable doubt that defendant discharged the firearm.

¶ 60    Defendant further argues that the lack of physical evidence supports the conclusion that he was not the shooter.  Defendant notes that the firearm used in the shooting was never recovered and there was no DNA, fingerprint, or gunshot residue evidence admitted which would indicate defendant ever fired a weapon.  Defendant stresses the medical examiner's testimony which provided that there was no stippling on McIntyre's head as evidence that he was not shot at close range.

¶ 61    We agree with defendant that no DNA, fingerprint, or gunshot residue evidence was admitted into evidence establishing defendant as the shooter.  We disagree, however, with defendant's interpretation of the medical examiner's testimony.  Dr. Escobar-Alvarenga testified that the range of firing in this case was "indeterminate."  She later clarified on cross-examination and redirect that this means the weapon could have been fired from more than 10 feet away or from closer than two feet away.  She further testified that the gun powder residue, which causes stippling, could be filtered out if the victim was wearing a hat or by the victim's hair or blood. Officer Foster testified that he discovered a baseball cap behind the driver's seat of the SUV. The baseball cap had red blood-like stains on the interior sides and brim of the hat, but did not have any apparent defects.  This evidence supports the reasonable inference that McIntyre had been wearing a hat at the time but the bullet did not penetrate the baseball cap.  See *People v. Wheeler*, 226 Ill. 2d 92, 116 (2007) (a reviewing court must give the State the benefit of all reasonable inferences).  Moreover, Dr. Escobar-Alvarenga testified that hair or blood could filter

out the gunshot residue. While McIntyre's hair was short, the responding officers testified to a large amount of blood being present in the vehicle. Overall, Dr. Escobar-Alvarenga's testimony leaves open the possibility that McIntyre could have been shot in close range and it is apparent by the jury's verdict that they accepted this fact.

¶ 62    In sum, we conclude that the evidence that defendant personally discharged a firearm was not so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of his guilt. See *People v. Brown*, 2015 IL App (1st) 130048, ¶ 34; *People v. Lavelle*, 396 Ill. App. 3d 372, 384 (2009); see also *People v. Kaszuba*, 375 Ill. App. 3d 262, 268 (2007).

¶ 63                                      Sentence

¶ 64    Next, defendant argues that his 110-year plus natural life sentence violates the proportionate penalties clause of the Illinois Constitution as applied where he was an "emerging adult" at only 19 years old at the time he committed the offense and the trial court failed to consider his youth and its attendant characteristics in accordance with *Miller v. Alabama*, 567 U.S. 460 (2012) (*Miller*), in determining his sentence. Accordingly, defendant requests we remand this case to the circuit court for a new sentencing hearing and the imposition of a sentence of 71 years or less.

¶ 65                          *Proportionate Penalties Clause*

¶ 66    Defendant maintains that his sentence violates the proportionate penalties clause of the Illinois Constitution, which provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art 1, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338

(2002) (*Leon Miller*). Defendant now seeks to extend the reasoning of *Miller* and its progeny to young adults age 19 under our state proportionate penalties clause.

¶ 67    To make a successful as-applied constitutional claim, a defendant must establish that a constitutional violation arose from an application of the statutory sentencing scheme to a specific set of facts or circumstances. *People ex rel. Hatrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 12. "Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *People v. Thompson*, 2015 IL 118151, ¶ 37. Reviewing courts cannot find an as-applied constitutional violation without an evidentiary hearing and findings of fact, and our courts have found such requests by defendants on appeal to be premature. *People v. Mosley*, 2015 IL 115872, ¶ 47 (quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004)).

¶ 68    In this regard, we find *People v. Harris*, 2018 IL 121932, to be dispositive. Similar to the case at bar, the *Harris* defendant was over the age of 18 when he committed the offense, and he argued that the court should extend *Miller* to his specific circumstances. *Id.* ¶ 37. The defendant conceded that he raised his *Miller* claim for the first time on appeal but argued that under *People v. Holman*, 2012 IL 120655, the court should consider his claim because the record contained enough information about his personal history to allow the court to decide whether the evolving science on juvenile maturity and brain development relied upon in *Miller* applied to the defendant. *Harris*, 2018 IL 121932, ¶ 42. After distinguishing the defendant's claim from the claim made in *Holman*, the *Harris* court declined to consider the defendant's proportionate penalties clause challenge where the record was not sufficiently developed to determine whether *Miller*'s characteristics attendant with youth applied specifically to defendant; therefore, the defendant's as-applied constitutional claims were forfeited when he failed to raise them before

the trial court. *Id.* ¶ 46.

¶ 69 Our supreme court reached a similar conclusion in *People v. Thompson*, 2015 IL 118151, ¶ 38. There, the defendant was 19 years old when he committed the offense, and he argued that the science that *Miller* applied to those who were under 18 years old when they committed their crimes also should be applied to those who were 18 to 21 years old when they committed their crimes. *Id.* The court found that the record did not contain any facts explaining why that science should be extended to those over 18 years old or why that science applied to the circumstances of defendant's case. *Id.* The court then reasoned that the trial court was the most appropriate court to develop the facts needed to address defendant's as-applied claim. *Id.*

¶ 70 As in *Harris* and *Thompson*, defendant here maintains that the record is sufficient where it establishes his lack of a criminal background, family support, and his education. These factors, however, concern only basic information about defendant and do not address how evolving brain science and other *Miller* factors apply to this specific defendant. To reiterate the words of our supreme court, "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Harris*, 2018 IL 121932, ¶ 39. Accordingly, as the record here does not contain sufficient facts to explain why the science relied upon in *Miller* would apply to defendant's circumstances, we conclude that this issue is premature. See *id.* ¶ 46; *Thompson*, 2015 IL 118151, ¶ 38.

¶ 71 In support of his argument, defendant relies on *People v. House*, 2019 IL App (1st) 110580-B, which has since been reversed in part and vacated in part by our supreme court in *People v. House*, 2021 IL 125124. In *House*, the defendant, who had just turned 19 years old at the time of the offense, was convicted of two counts of first-degree murder and aggravated kidnapping where the evidenced established that he, while armed with a firearm, acted only as a

lookout and had no criminal background. The 19-year-old *House* defendant received two consecutive, mandatory life sentences for murder under an accountability theory to run consecutively to two terms of 30 years for aggravated kidnapping. *Id.* ¶¶ 6, 7. These mandatory life sentences were required by statute. *Id.* ¶ 9. While his direct appeal was pending, the defendant filed a *pro se* petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2008)), raising a claim that his mandatory natural life sentence violated the proportionate penalties clause of the Illinois Constitution and a claim of actual innocence. *Id.* ¶ 7. The circuit court dismissed his postconviction petition for lack of jurisdiction; however, the defendant appealed and the appellate court vacated the dismissal and remanded the matter for second-stage postconviction proceedings. *Id.* On remand, counsel was appointed and the defendant raised, in pertinent part, that his mandatory sentence of natural life violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). *Id.* ¶ 8. The circuit court granted the State's motion to dismiss the petition at the second stage of the postconviction proceedings. *Id.*

¶ 72    The appellate court affirmed the dismissal on the other issues raised in the defendant's postconviction petition, but vacated the defendant's sentence after finding that his mandatory natural life sentence violated the Illinois proportionate penalties provision as applied, and remanded for resentencing. *Id.* ¶ 9. The appellate court reasoned that applying the mandatory natural life sentencing statute to the defendant violated the proportionate penalties clause because it precluded consideration of mitigating factors, specifically the defendant's age, level of culpability, and criminal history. *Id.* ¶ 10. The appellate court concluded that the defendant's mandatory natural life sentence shocked the moral sense of the community and vacated his

sentence and remanded for resentencing. *Id.* Because it found the mandatory natural life sentence unconstitutional as applied to the defendant under the proportionate penalties clause of the Illinois Constitution, the appellate court declined to address the defendant's remaining constitutional challenges, including those under the eighth amendment. *Id.*

¶ 73   Both parties appealed and our supreme court denied the State's petition for leave to appeal as a matter of right and issued a supervisory order directing the appellate court to vacate its judgment and reconsider the effect of this court's opinion in *Harris* on the issue of whether the defendant's sentence violated the proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 11. Aside from the proportionate penalties clause claim, our supreme court in *House* also denied the defendant's petition for leave to appeal concerning the dismissal of his remaining postconviction claims. *Id.*

¶ 74   On remand, the appellate court again affirmed the dismissal of the defendant's postconviction petition on the remaining claims, vacated petitioner's sentence based on its conclusion that his mandatory natural life sentence violated the proportionate penalties clause of the Illinois Constitution, and remanded for resentencing. *Id.* In regard to *Harris*' application to the defendant's postconviction proportionate penalties clause claim, the appellate court concluded that the reasoning in *Harris* and *Thompson* was limited to cases where a defendant raises an as-applied challenge on direct review or when the defendant is guilty as a principal rather than as an accomplice. *Id.* ¶ 30.

¶ 75   Our supreme court disagreed with this understanding of *Harris* and *Thompson* stating, "our analysis in *Harris* focused on development of the record in the trial court, not whether the challenge is raised in a collateral proceeding or on appeal, or whether the petitioner was a principal rather than an accomplice in the crime." *Id.* ¶ 31. The court concluded "that the

appellate court erroneously held that [the defendant's] sentence of natural life violated the proportionate penalties clause of the Illinois Constitution as applied to him without a developed evidentiary record or factual findings on the as-applied constitutional challenge." *Id.* Finding that the *House* case "requires further development," the supreme court remanded the cause to the circuit court for second-stage postconviction proceedings. *Id.*

¶ 76    In line with our supreme court's holdings in *House*, *Harris*, and *Thompson*, we conclude that the record is not sufficiently developed so as to address defendant's as-applied constitutional claim. As defendant has failed to direct this court to any case law that requires us to remand the matter to the trial court so he may develop the record, we decline to do so here. We note, however, that defendant is not precluded from raising this issue in a postconviction petition. As indicated by our supreme court's opinion in *House*, that venue is proper for further development of an as-applied proportionate penalties provision claim. See *House*, 2021 IL 125124, ¶ 32.

¶ 77    Defendant further asserts that this court should remand for resentencing where his counsel was ineffective for failing to challenge the constitutionality of his sentence in the trial court. As this court did in *People v. Ortega*, 2021 IL App (1st) 182396, ¶ 114, we also "decline defendant's invitation to bypass the clear mandate of *Harris* by considering his claim of ineffective assistance of counsel." This conclusion is further supported by our supreme court's recent decision in *House*, as previously discussed. As defendant has presented no authority for this court to bypass *House* and *Harris* in this way, "we will not do indirectly what we cannot do directly" and therefore find his ineffective assistance of counsel claim fails. *Id.* (declining to consider the 19-year-old defendant's ineffective assistance of counsel claim where it was alleged counsel was ineffective for failing to raise constitutional issues to the defendant's natural life sentence).

¶ 78                                    *Excessive Sentence*

¶ 79    In the alternative, defendant maintains that his sentence is excessive where the trial court

failed to give any weight to his age at the time of the offenses.  Defendant requests this court find

his sentence was excessive and either reduce his sentence to the minimum sentence of 71-years'

imprisonment or remand the matter for sentencing.

¶ 80    The Illinois Constitution provides that, "[a]ll penalties shall be determined both according

to the seriousness of the offense and with the objective of restoring the offender to useful

citizenship."  Ill. Const. 1970, art. I, § 11.  "This constitutional mandate calls for balancing the

retributive and rehabilitative purposes of punishment, and the process requires careful

consideration of all factors in aggravation and mitigation."  (Internal quotation marks omitted.)

*People v. Cunningham*, 2018 IL App (4th) 150395, ¶ 36.  Additionally, the Unified Code of

Corrections (730 ILCS 5/5-5-3.1 to 5-5-3.2 (West 2018)) sets forth mitigating and aggravating

factors the court must consider prior to issuing its sentence.  The court, however, is not required

to recite or assign a specific value to each mitigating and aggravating factor it has considered.

*People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38.  Instead, we presume that the court

appropriately weighed the mitigating evidence before it, including the defendant's rehabilitative

potential, absent some indication in the record to the contrary, apart from the sentence itself.

*People v. Johnson*, 2020 IL App (1st) 162332, ¶ 95; *People v. McDonald*, 322 Ill. App. 3d 244,

251 (2001).

¶ 81    "The trial court has broad discretionary powers in imposing a sentence, and its

sentencing decisions are entitled to great deference."  (Internal quotation marks omitted.)  *People*

*v. Pina*, 2019 IL App (4th) 170614, ¶ 19.  A sentence that is within the statutory range provided

by the legislature is presumed to be proper, and the trial court's sentence will not be disturbed on

appeal absent an abuse of discretion. *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 104. The sentencing court abuses its discretion where the sentence is "greatly at odds with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Id.* In reviewing a defendant's sentence, a court of review "must not substitute its judgment for that of the trial court merely because it would have weighed [the] factors differently." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Rather, the weight to be given to each mitigating and aggravating factor is "left to the sound discretion of the trial court." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 104.

¶ 82    Here, defendant was convicted of first-degree murder and attempted first-degree murder. The jury also specially found that he personally discharged a firearm during the offenses. Defendant was therefore eligible to receive a prison sentence of between 71 years (20 year minimum for first-degree murder, six year minimum for attempted murder, and 45 years for personally discharging a firearm) and 110 years to life (60-year maximum sentence for first-degree murder, 30-year maximum sentence for attempted murder, plus mandatory term of life in prison for personally discharging a firearm during the murder, and a 20-year mandatory enhancement for personally discharging a firearm during the attempted murder). See 730 ILCS 5/5-4.5-20(a) (West 2014); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014); 720 ILCS 5/8-4(c)(1)(C) (West 2014). Although defendant received the maximum sentence, it is within the applicable sentencing range, and therefore we presume it was proper. See *People v. Brown*, 2018 IL App (1st) 160924, ¶ 9.

¶ 83    Nonetheless, defendant claims the court abused its discretion in sentencing him because it was required to consider his age during sentencing and that this consideration is even more imperative when sentencing an emerging adult offender, "given what we now know about how

the brain develops." While defendant cites to the general proposition that a trial court must consider all of the factors of aggravation and mitigation in sentencing including the defendant's age, he cites no authority which would require this court to vacate a sentence that is within the statutory range and was fully considered by the trial court. Furthermore, while the Supreme Court has recognized that minors are less morally culpable and have a greater capacity for rehabilitation than adults who commit similar crimes, the Court has also stated that the Constitution does not categorically bar lengthy terms for juveniles. See *Jones v. Mississippi*, 593 U.S. ___, 141 S. Ct. 1307, at 1314-15 (2021) (finding that the eighth amendment allows juvenile offenders to be sentenced to life without parole as long as the sentence is not mandatory and the sentencing court had discretion to consider youth and attendant characteristics but that no factfinding by the sentencer is required); *Miller*, 567 U.S. at 480 (declining to foreclose the possibility of discretionary life sentences for juvenile homicide offenders); see also *People v. Davis,* 2014 IL 115595, ¶ 43 ("A minor may still be sentenced to natural life imprisonment without parole so long as the sentence is at the trial court's discretion rather than mandatory."). But defendant was not a minor when he committed these offenses and no reported authority holds that an adult defendant's relative youth, standing alone, renders a sentence longer than the statutory minimum excessive. As such, the court was within its discretion to reject the argument that defendant was entitled to a minimum sentence. See *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 16.

¶ 84    Even so, the record demonstrates that the trial court was aware of defendant's age, as defense counsel argued in mitigation that defendant's sentence should be lessened due to his young age. Defendant's age was also included in the PSI reviewed by the trial court. See *People v. Madura*, 257 Ill. App. 3d 735, 740-41 (1994) (where mitigation and a sentencing report have

been submitted to the trial court, it is presumed, absent any evidence to the contrary, that the court considered the evidence and took into account the defendant's potential for rehabilitation). Defendant presents this court with no evidence that the trial court failed to consider his age in sentencing and thus fails to meet his burden. See *People v. Lampley*, 405 Ill. App. 3d 1, 11 (2010) (a trial court is presumed to have considered any mitigating factors absent a showing to the contrary).

¶ 85     " 'A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense.' " *People v. Mays*, 2012 IL App (4th) 090840, ¶ 66 (quoting *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007)); see also *People v. Anderson*, 325 Ill. App. 3d 624, 637 (2001) ("a court is not required to give the defendant's rehabilitative potential more weight than the seriousness of the offense"). Here, defendant was sentenced to the maximum penalty as allowed by our legislature. Defendant's sole contention on appeal is that the trial court abused its discretion because it failed to consider his age when sentencing him. Notably, defendant fails to argue in what way his sentence is manifestly disproportionate to the nature of the offenses he committed. The trial court, however, made clear when rendering defendant's sentence that the nature of the offenses was serious, deliberate, and coldblooded. See *People v. Fern*, 189 Ill. 2d 48, 53 (1999) (the trial judge is in the best position to make a reasoned judgment, weighing factors such as its direct observations of the defendant and his character). As the evidence demonstrates, defendant committed two serious offenses, the first-degree murder of McIntyre and the attempted first-degree murder of Kellum. Defendant, in conjunction with his codefendants, planned the robbery and execution of McIntyre along with anyone who was accompanying him. In planning the robbery, defendant boasted to the witnesses that he was in possession of a weapon and that, not only did he intend to shoot the

victims, but that "somebody is going to die today." His brazen, coldblooded nature was apparent in the testimony of the witnesses and further demonstrated by the fact defendant and his codefendants then carried out their plan exactly as the witnesses had described. The trial judge who sentenced defendant was intimately aware of the facts and evidence presented in the case and we cannot say that he abused his discretion when sentencing defendant to the maximum sentence. See *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2010) ("mitigating factors do not automatically require the sentencing judge to give less than the maximum sentence").

¶ 86                                    CONCLUSION

¶ 87    For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 88    Affirmed.